**Tracy Dale DATE, Petitioner,**

v.

**Dora B. SCHRIRO, et al., Respondents.**

**No. CV 07–368–PHX–MHM (LOA).**

United States District Court,
D. Arizona.

Nov. 26, 2008.

Tracy D. Date, Winslow, AZ, pro se.

Kent E. Cattani, Office of the Attorney General, Phoenix, AZ, for Respondents.

## ORDER

MARY H. MURGUIA, District Judge.

Petitioner Tracy Dale Date ("Petitioner"), *pro se,* filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on February 20, 2007; the Petition raises 24 claims for relief. (Dkt. # 1). The Court referred the matter to United States Magistrate Judge Lawrence O. Anderson, who issued a 68–page Report and Recommendation on July 22, 2008, recommending that the Court deny all 24 claims of Petitioner's Petition for Writ of Habeas Corpus. (Dkt. # 19). Petitioner filed a written objection to the Report and Recommendation on September 19, 2008. (Dkt. # 22).

### I. STANDARD OF REVIEW

A district court must review *de novo* the legal analysis in a Magistrate Judge's Report and Recommendation. *See* 28 U.S.C. § 636(b)(1)(C). In addition, a district court must review *de novo* the factual analysis in the Report and Recommendation for those facts to which objections are filed. *See United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc); *see also* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "Failure to

object to a magistrate judge's recommendation waives all objections to the judge's findings of fact." *Jones v. Wood,* 207 F.3d 557, 562 n. 2 (9th Cir.2000).

## II. BACKGROUND

Petitioner is currently serving a sentence of life imprisonment with the possibility of parole after serving 25 calendar years for conspiracy to commit first degree murder, A.R.S. §§ 13–1003, 1105. (Dkt. # 19, pp. 9–12). After direct appeal and post-conviction review, Petitioner filed the instant Petition for Writ of Habeas Corpus, raising 24 claims for relief. (*id.,* p. 15). After reviewing the Petition, Respondents' Answer, and Petitioner's Traverse, Magistrate Judge Anderson issued a detailed Report and Recommendation, recommending that the Court deny the Petition. (*id.,* p. 68). Petitioner subsequently objected to the Report and Recommendation on all 24 claims for relief in his Petition. (Dkt. # 22).

In his objection, Petitioner simply restates most of his claims for relief and then states that he objects to the Magistrate Judge's denial of his claims and relies on his Traverse to the State's Answer to his Petition for Writ of Habeas Corpus. (*id.*). However, Petitioner provides substantive objections with respect to two of his claims for relief: (1) that his conviction violates the Fourteenth Amendment because there was insufficient evidence to prove that he and his co-conspirators intended to cause the death of another person (Dkt. # 22, pp. 2–7), and (2) that his trial counsel was ineffective in violation of the Sixth Amendment because he advised Petitioner that Petitioner could not be found guilty of conspiracy to commit first degree murder based on conditional intent (*id.,* pp. 12–17).

## III. DISCUSSION

Petitioner makes a number of objections to Magistrate Judge Anderson's Report and Recommendation without giving any explanation as to why he believes that the Magistrate Judge's legal or factual analysis is incorrect. Specifically, Petitioner gives no explanation for his objections to Grounds II through X and Grounds XI(B) through XXIV. After a thorough and independent review of those issues as presented, the Court finds itself in agreement with Magistrate Judge Anderson's Report and Recommendation. As such, the Court will adopt the Report and Recommendation on those claims without further discussion and deny Petitioner's Petition for Writ of Habeas Corpus with respect to Grounds II through X and XI(B) through XXIV.

However, Petitioner substantively objects to the Magistrate Judge Anderson's Report and Recommendation on Grounds I and XI(A) in his Petition for Writ of Habeas Corpus. As such, the Court will now turn to those claims for relief.

### A. Ground I—Fourteenth Amendment

In Ground I of his Petition for Writ of Habeas Corpus, Petitioner alleges that his conviction violates the Fourteenth Amendment because there was insufficient evidence to prove that he and his co-conspirators intended to cause the death of another person. (Dkt. # 1, p. 15). In his Report and Recommendation, Magistrate Judge Anderson found that Petitioner's Fourteenth Amendment claim is unexhausted and procedurally barred from federal habeas review, and in the alternative fails on the merits because Petitioner has not established that the state court's resolution of his claim was contrary to or resulted in an unreasonable application of federal law. (Dkt. # 19, pp. 27, 31).

Petitioner appears to concede that his claim is unexhausted and procedurally barred from federal habeas review absent a showing of "cause and prejudice" or "fundamental miscarriage of justice." *See* Dkt. # 22, p. 2 (contending that he "meets both prongs of 'cause and prejudice' as well as 'fundamental miscarriage of justice' "). As discussed in the Report and Recommendation, Petitioner's mere citation to the Fourteenth Amendment on direct appeal was insufficient to exhaust the instant federal claim. *See, e.g., Shumway v. Payne,* 223 F.3d 982, 987 (9th Cir.2000) (insufficient for prisoner to have made "a general appeal to a constitutional guarantee"). In addition, the Court agrees with the Magistrate Judge's finding that Petitioner's claim is procedurally barred from federal habeas review; the Court disagrees with Petitioner's assertion that "[i]t is a fundamental miscarriage of justice to affirm a conviction for conspiracy to commit first degree murder based on something less than the required *mens rea* element of specific intent in this case." (Dkt. # 22, p. 2). However the Court will first turn to the merits of Petitioner's claim, and specifically Petitioner's assertion that the Arizona Court of Appeals's use of *Holloway v. United States,* 526 U.S. 1, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999), was "misplaced" and the Court's holding that conditional intent is sufficient to establish the *mens rea* for conspiracy to commit first degree murder violates the Fourteenth Amendment. (*Id.,* p. 7).

At the time of Petitioner's trial, first degree murder under A.R.S. § 13–1105 was considered a "specific intent" crime, requiring the specific intent to kill another person. *See* Dkt. # 19, p. 28; *State v. Murray,* 184 Ariz. 9, 32, 906 P.2d 542 (1995). However, Arizona courts had not yet addressed the question of whether "conditional intent" was sufficient to satisfy the *mens rea* requirement of a "specific

intent" crime. *See id.* at p. 29. The Arizona Court of Appeals considered that question on appeal and relied on *Holloway* and *People v. Vandelinder,* 192 Mich.App. 447, 481 N.W.2d 787 (Mich.1992), to hold that Petitioner's claim failed because conditional intent was in fact sufficient under Arizona law to establish the *mens rea* for conspiracy to commit first degree murder. *See* Dkt. # 19, p. 29. Petitioner argues that Court of Appeals's conclusion is based on an improper extension of the principle espoused in *Holloway* and is contrary to the Arizona Supreme Court's ruling in *Evanchyk v. Stewart,* 202 Ariz. 476, 47 P.3d 1114 (2002).

█ As the Magistrate Judge clearly stated, the appropriate standard of review applicable to Petitioner's request for federal habeas relief is whether the state court's adjudication of Petitioner's federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established *Federal law,* as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added). As such, to the extent that Petitioner challenges the Arizona Court of Appeals's application of *state law,* e.g., *Evanchyk,* his claim is not cognizable on federal habeas review. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

█ However, in rejecting Petitioner's Fourteenth Amendment claim, the Arizona Court of Appeals also cited to the U.S. Supreme Court's decision in *Holloway* for the proposition that "a defendant may not negate a proscribed intent by requiring a victim to comply with a condition he has no right to impose; an intent to kill, in the alternative, is nevertheless, an intent to

kill." 526 U.S. at 9, 119 S.Ct. 966. In *Holloway,* the Supreme Court found that conditional intent satisfied the intent requirement in the federal car-jacking statute, 18 U.S.C. § 2119, which required the defendant to have the requisite intent to commit the crime. Thus, because Arizona's statute governing conspiracy to commit first-degree murder also required the defendant to have the requisite intent to commit the crime, the Arizona Court of Appeals drew an analogy between the two statutes to find that conditional intent satisfied the intent requirement under A.R.S. § 13–1005.

Despite Petitioner's etymological foray into the uses and misuses of the word "intent," Petitioner offers no sufficient explanation for why the Arizona Court of Appeals's application of the principle espoused in *Holloway* to Arizona's statute governing conspiracy to commit first-degree murder was contrary to or resulted in an unreasonable application of federal law. Petitioner merely states that *"Holloway* is a completed offense under a federal car-jacking statute (18 U.S.C. § 2119) whereas the instant case is an Arizona conspiracy (a preparatory offense governed by A.R.S. § 13–1003) (A.R.S. § 13–1105)." Dkt. # 22, p. 3. However, Petitioner appears to confuse *mens rea,* the intent element, with *actus reus,* the objective element of a crime; the issue before the Arizona Court of Appeals was whether "conditional intent" was sufficient to satisfy the *mens rea* requirement of a "specific intent" crime. Petitioner cites the Court to no authority to support his contention that the Arizona Court of Appeals's citation to the Supreme Court's statement in *Holloway* resulted in an unreasonable application of federal law. As such, the Court finds that even if Petitioner's claim was not procedurally barred, it would fail on the merits; the Court agrees with the Report and Recommendation.

### i. Procedural Bar

■ If a federal constitutional claim can no longer be in state court due to a failure to follow the prescribed procedure for presenting such an issue, the claim is procedurally barred and the petition must be denied. *See Johnson v. Lewis,* 929 F.2d 460, 463 (9th Cir.1991). As discussed above, and in the Report and Recommendation, Petitioner did not present Ground I and most of his other federal claims to the state courts in a sufficient manner, and any attempt to now return to state court to present those claims would be futile because they would be procedurally barred pursuant to Arizona law. *See* Dkt. # 19, pp. 22–23, 63–68. Because Petitioner has procedurally defaulted his claim for relief in Ground I, among others, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *See, e.g., Cook v. Schriro,* 516 F.3d 802, 827–29 (9th Cir.2008).

■ To establish "cause," a petitioner must establish that some objective factor external to the defense, such as interference by state officials, a showing that the factual or legal basis for a claim was not reasonably available, or constitutionally ineffective assistance of counsel, impeded his efforts to comply with the state's procedural rules. *Id.* And to establish "prejudice," Petitioner must show actual harm resulting from a constitutional violation or error. *Magby v. Wawrzaszek,* 741 F.2d 240, 244 (9th Cir.1984). However, whether a petitioner fails to establish cause, the Court need not consider whether the petitioner has shown actual prejudice resulting from the alleged constitutional violations. *Smith v. Murray,* 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

■■ Petitioner argues that "cause" is shown here because of ineffective assis-

750

tance of counsel due to his appellate counsel's failure to raise his Fourteenth Amendment claim on direct appeal. However, before an ineffective assistance of counsel claim can be considered "cause" to excuse the procedural default of another constitutional claim, the petitioner must have fairly presented the ineffective assistance of counsel claim in state court as an independent claim. But the record reflects that Petitioner did not properly exhaust in state court a claim that appellate counsel was ineffective for failing to properly raise his claim on direct appeal, and thus any deficiency in counsel's representation cannot excuse Petitioner's procedural defaults on this claim. The Court agrees with the Report and Recommendation.

 Petitioner also argues that he is asserting a claim of actual innocence and has satisfied the requirement to show a "fundamental miscarriage of justice." Dkt. # 22, p. 2. To establish a "fundamental miscarriage of justice," Petitioner must establish that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence. *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). However, despite his assertions that failure to consider his claims will result in a fundamental miscarriage of justice, Petitioner points to no newly discovered evidence such that no reasonable juror would have found him guilty beyond a reasonable doubt. Petitioner merely discusses the Arizona Court of Appeals's alleged constitutional violation, discussed above, of finding that "conditional intent" is sufficient to convict a person of the crime of conspiracy to commit first degree murder. Further, there is no evidence that the jury convicted Petitioner of conspiracy to commit first degree murder based solely on conditional intent. *See*

Dkt. # 19, p. 63. As such, Petitioner has not established a fundamental miscarriage of justice and shown that a constitutional violation has occurred and resulted in the conviction of one who is actually innocent. The Court agrees with the Report and Recommendation.

**B. Ground XI(A)—Sixth Amendment**

 This claim is properly before the Court on federal habeas corpus relief. *See* Dkt. # 19, p. 57. In Ground XI(A) of his Petition, Petitioner alleges that his trial counsel was ineffective in violation of the Sixth Amendment because counsel advised Petitioner that he could not be found guilty of conspiracy to commit first degree murder based on conditional intent. (Dkt. # 19, p. 57). Petitioner alleges that based on counsel's erroneous advice, he rejected the State's plea offer, and had counsel correctly interpreted the law, Petitioner "could have made a knowing, voluntary and intelligent decision whether or not to proceed to trial and avoid a life sentence." (Dkt. # 1, p. 15).

 As Magistrate Judge Anderson detailed in his Report and Recommendation, to establish ineffective assistance of counsel, Petitioner must establish that: (1) counsel's performance fell below objective standards of reasonableness and fell "outside the wide range of professionally competent assistance," and (2) that counsel's performance prejudiced Petitioner by creating "a reasonable probability that absent the errors the fact finder would have had a reasonable doubt respecting guilt." *Strickland v. Washington,* 466 U.S. 668, 687–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hill v. Lockhart,* 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985); *see also Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack

of sufficient prejudice ... that course should be followed.").

■ To establish prejudice in the context of a plea offer, Petitioner must demonstrate that "but for counsel's error, he would have pleaded guilty and would not have insisted on going to trial." *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir.2002) (citation omitted). Although Petitioner asserted in his Petition only that "[h]ad counsel correctly interpreted the law, [he] could have made a knowing, voluntary and intelligent decision whether or not to establish prejudice," Dkt. # 1, p. 15, Petitioner now alleges in his objection to the Report and Recommendation· that he "most definitely would have signed a plea agreement for a six year sentence to avoid being sentenced to life in prison had he been properly informed by trial counsel that there was even the slightest possibility of a conviction as to Count I." Dkt. # 22, p. 17. But *Strickland* requires that a petitioner establish a "reasonable probability" of prejudice, showing evidence "sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052. Here, Petitioner offers no evidence other than his own self-serving statements that but for counsel's failure to tell him that there was some possibility that he could be found guilty of conspiracy to commit first degree murder based on conditional intent, he would have pled guilty and not insisted on going to trial.

Still, Petitioner is correct that "in cases such as this where the question turns on the motivation of the defendant—that is, what would the defendant have done if supplied with accurate information—the amount of objective evidence will quite understandably be sparse." *Lewandowski v. Makel*, 949 F.2d 884, 889 (6th Cir.1991). However, in *Lewandowski*, the defendant had already initially entered a plea agreement, and then withdrew his plea based on

his counsel's alleged ineffective assistance. *Id.* at 888–89. The Sixth Circuit found that the fact that the defendant had already accepted a plea was sufficient objective evidence to support his contention that but for his counsel's error, he would have pled guilty rather than insisted on going to trial. That is not the case here; there is no evidence other than Petitioner's own self-serving statement that he would have accepted the plea had his counsel informed him of the possibility of conviction. In fact, as the Magistrate Judge pointed out, Petitioner, in his Petition, merely stated that had counsel informed him correctly, he could have made a knowing decision on whether or not to proceed to trial. That statement belies Petitioner's current insistence that he "most definitely would have signed a plea agreement" but for counsel's alleged error. As such, the Court agrees with the Report and Recommendation and finds that Petitioner has not established prejudice under *Strickland v. Washington*.

■ Moreover, it is "universally recognized" that "an attorney is not liable for an error of judgment on an unsettled proposition of law"; "giving ... legal advice that later is proven to be incorrect [ ] does not necessarily fall below the objective standard of reasonableness." *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir.1999). At the time of Petitioner's trial in 2001, Arizona courts had not addressed whether "conditional intent" satisfied the mens rea of a "specific intent" crime, and the States that had addressed that issue were split; Arizona law was unsettled on this issue. *See* Dkt. # 19, pp. 60–61. As such, counsel's advice to Petitioner that he could not be found guilty of conspiracy to commit first degree murder based on conditional intent in Arizona at that time did not fall below an objective standard of reasonableness. *See id.*, pp. 61–62. The Court agrees with the Report and Recom-

mendation, see Dkt. # 22, pp. 60–62, and finds the counsel's advice to Petitioner did not fall below an objective standard of reasonableness.

**Accordingly,**

**IT IS HEREBY ORDERED** that Petitioner's objections to Magistrate Judge Anderson's Report and Recommendation are overruled. (Dkt. # 22).

**IT IS FURTHER ORDERED** that the Magistrate Judge's Report and Recommendation is adopted in its entirety. (Dkt. # 19).

**IT IS FURTHER ORDERED** that Petitioner's Petition for Writ of Habeas Corpus is DENIED. (Dkt. # 1).

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

## REPORT AND RECOMMENDATION

LAWRENCE O. ANDERSON, United States Magistrate Judge.

This matter arises on Petitioner's Petition for Writ of Habeas Corpus by Person in State Custody Pursuant to 28 U.S.C. § 2254. (docket # 1) Respondents have filed an Answer to which Petitioner has replied. (dockets ## 13, 18, respectively)

## I. Factual and Procedural Background

The following events gave rise to Petitioner's challenged convictions and sentences.

### A. Factual Background, Charges, Trial and Sentence

In May 2000, David Goldberg and Dennis Schilinski were prisoners in the Mohave County Jail. (Petitioner's Exh. C)

Robert Olsen, an inmate in the adjoining cell, befriended with Goldberg. (Respondents' Exh. FF: Tr. 1/10/01, at 86–87, 89–91) Goldberg was a co-defendant with Eugene Cofsky and his wife Sheri Cofsky in another case. (Respondents' Exh. GG: Tr. 1/11/06, at 139; Exh. JJ: Tr. 1/18/01, at 86; Exh. K: Tr. 1/19/01, at 67–68) The Cofskys, however, were out on bond. Olsen repeatedly overheard Goldberg discussing a plan to break out of jail. (Respondents' Exh. FF at 91, 107) The plan involved intercepting Goldberg while he was being returned to jail following his court appearance scheduled before Judge Steven F. Conn at 11:30 a.m. on June 12, 2000 at Mojave County Superior Court in Kingman, Arizona.[1]

According to the plan, Goldberg would be picked up in a van with sliding doors so that Goldberg, who would be chained, could "hop in." (*Id.* at 103–04, 113–14, 163–64) Once inside the van, Goldberg would "cut off his chains," "change his clothes," and then drive to a Carl's Jr. restaurant, where another car was "waiting," and "switch" vehicles. (*Id.*) Goldberg would then drive to Lake Havasu, "hide there for a week to two weeks" at a public campground, then travel to Mexico and ultimately Australia. (*Id.*)

The plan included a contingency that if the guard who was escorting Goldberg attempted to block the escape, Dennis Schilinski would "kill the guard" by "shoot[ing]" him. (*Id.* at 93–94, 97, 130) In exchange, Schilinski would receive "a large sum of money." (*Id.* at 130) Goldberg also told Olsen that several others were involved in the plan, including "Gene [Cofsky], Ron [Manning], [and] Gene's wife [Sheri Cofsky]." (*Id.* at 99) Goldberg told Olsen that "Gene" or "Eugene" Cofsky

---

1. The courthouse was across the street from the jail, and inmates would walk to and from the courthouse for court appearances, escorted by one correction officer. (Respondents' Exh. FF at 199–204).

was his "business partner and friend." (*Id.* at 99–100) Goldberg discussed his plan with Olsen on a "daily basis," between "30 and 60 times." (*Id.* at 94, 98–99, 107)

Olsen initially thought that Goldberg was "bragging," but as "days went on" Olsen realized that the plan was "very serious." (*Id.* at 94, 98) Concerned that the conspirators were "going to kill a guard" during the escape attempt, Olsen wrote a letter to his drug therapy counselor describing Goldberg's plan. (*Id.* at 104–09, 120–24, 164) About a week before the planned escape attempt, Schilinski was transported to the Clark County Detention Center in Las Vegas, Nevada, where he had outstanding traffic warrants. (Respondents' Exh. FF at 102; Exh. GG at 7–12) Goldberg told Olsen that "Gene" Cofsky had paid Schilinski's fines and taken him to his ranch, where he would stay until the jailbreak. (Respondents' Exh. FF at 103) Goldberg explained that they "didn't want to lose track of [Schilinski] because he was a key figure in this." (*Id.*)

Meanwhile, after Schilinski was transported to the Clark County Detention Center in Las Vegas, but before Cofsky had paid his fines to get him released, Schilinski told fellow inmate Daniel England about the planned escape attempt. (Respondents' Exh. GG at 7–13) Specifically, Schilinski told England that he had to "go break somebody out of jail" on "Monday at 11:30 on the 12th of June," just five days away, and to "watch the six o'clock news" that day. (*Id.* at 11, 13–15) Schilinski also told England that the person's name was "Dave" Goldberg. (*Id.*) Schilinski explained that a van with "two" people in it was going to pull over and "grab" Goldberg as he was being transported "from the court back to the jail" in Kingman. (Respondents' Exh. GG at 16–19, 31, 33, 54–55, 69, 81–82, 91, 94) Schilinski was going to tell the guard, "don't be a cow-

boy," and if he did anything or "made a move," he was going to "shoot him." (*Id.* 17, 54) Then they planned to "switch cars," and eventually travel to Australia. (*Id.* at 17–19) A person named "Eugene" (Cofsky) was responsible for the "placement of the vehicles." (*Id.*) Schilinski told England that Goldberg was going to pay him $150,000 for his participation. (*Id.* at 18) England alerted Las Vegas Police about the planned escape attempt. (*Id.* at 21–26)

On June 8, 2000, the Las Vegas Police Department contacted the Mohave County Detention Center and advised officials there of the planned jailbreak, including the names of several of the known conspirators—(1) "Dave" (Goldberg); (2) "Schilinski"; (3) "Eugene," with a last name that ended in a "ski-sounding word" (Eugene Cofsky); and (4) "Cheryl" (Sheri Cofsky). (Respondents' Exh. GG at 90–93, 98, 134–41) Mohave County jail officials verified Goldberg's status as an inmate at the jail and that he had an upcoming court appearance scheduled for June 12, 2000 at 11:30 a.m. at the Mohave County Courthouse. (*Id.*) They also verified Schilinski's status as a former inmate and his relationship with Goldberg. (Respondents' Exh. GG at 140–44) Officials discovered that Eugene and Sheri Cofsky were identified as codefendants in Goldberg's case. (*Id.*) After obtaining the foregoing information, Mojave County Jail officials contacted the Mohave County Sheriff's Department. (Respondents' Exh. GG at 134–41)

That weekend, the Mohave County Sheriff's Department, the Federal Bureau of Investigation, and the Arizona Department of Public Safety, set up surveillance at the Cofsky residence, approximately 13 miles outside of Kingman, and throughout Kingman's city limits, particularly the Mohave County Courthouse and the Mohave County Detention Center. (Respondents' Exh. GG at 173–79; Exh. HH: Tr. 1/12/01,

at 6–7, 16, 125–30, 138–40; Exh. II: Tr. 1/17/01, at 17–24, 117–19, 234–37; Exh. JJ at 13–17, 49–59) At approximately 6:00 p.m. on June 11, 2000, officers saw Petitioner and co-defendant, Tawanee Barrett,[2] arrive together at the Cofsky residence in a black Mercury Mountaineer. (Exh. HH at 130–35; Exh. KK at 56–58; Exh. LL: Tr. 1/23/01, at 4–7) Officers also noticed a silver-blue Dodge Caravan minivan parked at the residence. (Exh. JJ at 58)

The next morning, at approximately 9:00 a.m., Eugene and Sheri Cofsky arrived at the Cofsky residence in a red pickup truck. (Respondents' Exh. GG at 180; Exh. HH at 149; Exh. LL at 21) At around 10:00 a.m., officers observed Petitioner, Barrett, and co-defendant Ronald Manning leave the Cofsky residence in the Mountaineer and drive to a Wal–Mart store in Kingman. (Respondents' Exh. HH at 143–49,-167–70; Exh. II at 245–48; Exh. JJ at 19–23; Exh. LL at 22–25) Petitioner, Barrett, and Manning purchased .38 caliber ammunition at Wal–Mart. (Respondents' Exh. HH at 167–70; Exh. LL at 22–25) The three then drove to Auto Zone and bought a pair of 18–inch bolt cutters. (*Id.*) They then returned to the Cofsky residence. (*Id.*)

At approximately 11:00 a.m., officers observed all three vehicles—the pickup truck, the minivan, and the Mountaineer—leave the Cofsky residence and drive to Kingman. (Respondents' Exh. GG at 185–90, 194; Exh. HH at 150–53, 177) Petitioner and Barrett were driving the Mountaineer, Manning was driving the minivan, and the Cofskys were driving the pickup truck. (Respondents' Exh. LL at 29–30, 45–46) Officers followed the vehicles into Kingman, and watched them drive to an old warehouse parking lot. (Respondents' Exh. HH at 154–55; Exh. LL at 30) At the warehouse parking lot, Petitioner and Manning removed the minivan's back seat and left it behind the building. (Respondents' Exh. GG at 195; Exh. LL at 30) Petitioner, Barrett, and Manning then drove to a parking lot at Arnold Plaza where Barrett backed the Mountaineer into a parking space and parked. (Respondents' Exh. GG at 161–63; Exh. LL at 30–31) Barrett stayed in the Mountaineer. Petitioner and Manning left in the minivan and headed towards the courthouse. (Respondents' Exh. II at 118–19, 125–26; Exh. JJ at 59–64; Exh. LL at 30–31) Meanwhile, the Cofskys drove to the courthouse and parked on the street in front of the courthouse. (Respondents' Exh. HH at 30) Around this same time, officers observed Schilinski arrive in a white Pontiac Trans Am[3] and park in a parking lot located between the courthouse and the jail. (Respondents' Exh. II at 25–31, 238–41; Exh. JJ at 61–62) Schilinski exited the vehicle, and began "looking all about, up and down the street in all different directions" in a "paranoid fashion." (*Id.*) Schilinski then walked around the courthouse, got back into the Trans Am, and drove away. (Respondents' Exh. II at 240) Schilinski returned "[s]everal minutes later," parked in the same parking lot, and went inside the jail's administration office. (*Id.* at 240–41) Schilinski then returned to his vehicle and left. (*Id.*) Shortly thereafter, officers saw Schilinski return to the courthouse, still "very, very nervous, looking around," and "scanning the area." (Respondents' Exh. II at 120–24; Exh. JJ at 61–62) Schilinski entered the courthouse, "rushed through" the security

---

**2.** Petitioner testified that Barrett was his fiancee. (Respondents' Exh. LL at 5)

**3.** The white Trans Am had been reported stolen earlier that morning in Laughlin, Nevada. (Respondents' Exh. II at 72–73).

checkpoint, and walked towards the elevators. (Respondents' Exh. HH at 18–25) An undercover officer followed Schilinski and got on the elevator with him. (*Id.* at 19) Schilinski "blurted out . . . they don't like it when you're late," and stated that he was expected in court. (*Id.*) The officer asked Schilinski which courtroom he was looking for, and Schilinski told him, "Judge Conn's courtroom." (*Id.* at 19–21) Schilinski then asked the officer if he was a "cop." (Respondents' Exh. HH at 20) The officer identified himself as a police officer and asked Schilinski his name. (*Id.*) Schilinski replied, "Dave Hausen." (*Id.*) Once at Judge Conn's courtroom, Schilinski approached the doors, "leafed through the court calendar," and then left. (*Id.* at 21–22) The undercover officer then looked at the court calendar, and noticed that Goldberg was scheduled to appear before Judge Conn at 11:30 a.m. (*Id.* at 22–23) Schilinski's name was not on the calendar. (*Id.* at 22) After Schilinski left the courthouse, the undercover officer observed the Cofskys enter the courthouse and proceed to Judge Conn's courtroom. (*Id.* at 25–29, 74–75) Several minutes later, Eugene Cofsky left the courtroom, made a brief phone call on a nearby pay phone, and then reentered the courtroom. (Respondents' Exh. HH at 27–29) Both Eugene and Sheri Cofsky then left the courtroom, and walked out of the courthouse, where they were immediately arrested. (*Id.*) Police discovered $10,700 in Eugene Cofsky's pants pocket. (*Id.* at 31) Police also found a day planner in Sheri Cofsky's purse that contained Schilinski's name, social security number, and date of birth, Manning's name and phone number, and the name, "Tracy" (Petitioner), with a corresponding telephone number. (*Id.* at 31–35) Officers searched the Cofsky's pickup truck parked outside the courthouse, and found a set of California license plates, which were not registered to the Cofskys. (Respondents' Exh. II at 181–83, 190) Police subsequently found Schilinski and arrested him. (Respondents' Exh. JJ at 68–69) Meanwhile, officers outside the courthouse observed the silver-blue minivan drive "right in front" of the courthouse. (Respondents' Exh. GG at 160–61, 193–94; Exh. II at 125–29; Exh. JJ at 62–65) Believing the conspirators "were going to be carrying out their plan," officers stopped the minivan, and ordered Petitioner and Manning to exit the vehicle. (Respondents' Exh. GG at 160–61, 167; Exh. II at 125–32, 242–43; Exh. JJ at 62–69) Manning was in the driver's seat, and Petitioner was crouched in the "back cargo area" of the van. (Respondents' Exh. II at 129–32, 244; Exh. JJ at 66) Petitioner was wearing "reflective sunglasses," had seven .38 caliber rounds of ammunition in his pocket, and was holding six more rounds in his hand. (Respondents' Exh. II at 41–42, 131; Exh. JJ at 66) Officers discovered two handguns in the van, one loaded with two .38 caliber rounds of ammunition, and a pair of worn surgical gloves. (Respondents' Exh. II at 132–35, 172–81; Exh. JJ at 67) Police arrested Petitioner and Manning and took them into custody. (Respondents' Exh. II at 133, 244; Exh. JJ at 11) Officers then stopped the Mountaineer that was still parked at Arnold Plaza, and arrested Barrett. (Respondents' Exh. GG at 161–67; Exh. HH at 157) Inside the Mountaineer, officers discovered: (1) two pairs of bolt cutters; (2) five .38 caliber rounds of ammunition; (3) a pair of plastic gloves similar to the pair found in the minivan; (4) a bag containing "extra large" men's clothing and a can of shaving cream; [4] (5) cell phones; (6) two license plates; and (7) a

---

4. Goldberg weighed approximately 260 pounds and had a beard. (Respondents' Exh. JJ at 73)

court document bearing Eugene Cofsky's name. (Respondents' Exh. II at 143–162, 223; Exh. JJ at 70–73, 87) The Nevada license plate on the back of the Mountaineer was covered with a California license plate that was not registered to any of the conspirators. (Respondents' Exh. II at 142,144–45, 188–191) Officers also searched the Cofsky residence and found: (1) $117,500 in cash; (2) a document bearing Eugene Cofsky's name which included the notation, "left Fourth, end, park van, white Grand Am"; (3) .38 caliber shell casings; and (4) a receipt from Wal–Mart for .38 caliber ammunition purchased on June 12, 2000 at 10:20 a.m. (Respondents' Exh. GG at 196–98; Exh. HH at 37–41, 161–70) A telephone calling card taken from Schilinski after his arrest indicated that he called the Cofsky residence at 8:28 a.m. on June 12, 2000. (Respondents' Exh. HH at 166)

Following his arrest, Manning waived his *Miranda* rights and agreed to be interviewed by police. (Respondents' Exh. II at 33–38) Initially, Manning denied knowledge of a plan to break Goldberg out of jail, but eventually admitted that he had "heard discussion about a plan to break Goldberg out of jail," involving a person named "Dennis" (Schilinski). (*Id.*) Manning admitted removing the minivan's back seat, but claimed that he did so because he was picking up "building supplies." (*Id.*)

Petitioner also waived his *Miranda* rights and agreed to talk with police. (Respondents' Exh. II at 40–47; Exh. JJ at 30–33) Petitioner told police that he had driven to Kingman with his girlfriend, Barrett, from Utah that weekend to meet Manning, whom he had known for a "couple of years." (Respondents' Exh. II at 40–47; Exh. JJ at 30–33) Petitioner admitted that: (1) he had been at the Cofsky's residence earlier that morning; (2) he helped Manning remove the back seat of the minivan; (3) the ammunition found in

his pocket was the same ammunition loaded in the handgun that was found in the minivan; and (4) he "handled" at least one of the two handguns found in the minivan. (Respondents' Exh. JJ at 30–33) When asked why he and Manning removed the seat from the van, Petitioner became "upset and agitated" and "no longer wanted to speak after that." (*Id.*) Petitioner denied any involvement in the conspiracy. (*Id.*)

Based on the foregoing events, on June 22, 2000, the State of Arizona filed an indictment in Mojave County Superior Court, charging Petitioner and each of his five codefendants (Schilinski, Eugene and Sheri Cofsky, Manning, and Barrett) with one count of conspiracy to commit first degree murder, a class 1 felony (Count 1), and one count of conspiracy to commit first degree escape, a class 4 felony (Count 2). Petitioner was also charged with one count of theft of a gun, a class 6 felony (Count IV). (Respondents' Exh. A)

Petitioner and codefendants Eugene Cofsky, Sheri Cofsky, and Manning were tried together before the Honorable Steven F. Conn. (Respondents' Exh. B: Minute Entry, dated 1/9/01) On the first day of trial, Petitioner filed a *pro se* motion for change of judge pursuant to Ariz. R.Crim.P. 10.1 claiming that "Judge Steven Conn has been mentioned by name alleging some unwilling participation." (Petitioner's Exh. P) The court denied the motion as untimely and noted that the motion was "so vague as to defy being able to be addressed in any way." (Petitioner's Exh. Q)

During trial, Petitioner testified that he and Barrett had traveled to the Cofsky residence to do construction work with Manning. (Respondents' Exh. LL at 3–7, 47) Petitioner stated that he was going to help with a septic system and mentioned that the Cofskys were digging a pool. (Respondents' Exh. LL at 48) Petitioner

testified that around 3:00 a.m. on June 12, 2000, he and Barrett drove to Wal–Mart to steal tools by hiding them in suitcases. (Respondents' Exh. LL at 13–17) He testified that he placed the suitcases containing tools by an emergency exit but he abandoned the tools because Barrett did not want to be involved. (Respondents' Exh. LL at 16–18) He further testified that he covered the Nevada license plate on his Mountaineer with a California plate. (Respondents' Exh. LL at 16–18, 36) Petitioner and Barrett returned to the Cofsky's ranch around 7:00 a.m. (Respondents' Exh. LL at 18–23) At around 10:00 or 11:00 a.m., Petitioner, Manning and Barrett went back to Wal–Mart to retrieve the tools. (Respondents' Exh. LL at 22) Petitioner testified that they split up once they arrived at Wal–Mart and that Manning purchased ammunition. (Respondents' Exh. LL at 23, 35) Petitioner testified that he did not retrieve the previously abandoned tools. (Respondents' Exh. LL at 23) Petitioner testified that they proceeded to Auto Zone and purchased bolt cutters needed to make a fence and to "wire all the rebar" for the pool that was being installed. (Respondents' Exh. LL at 24–25, 35) Thereafter, they returned to the Cofsky's residence. (Respondents' Exh. LL at 23–25)

Petitioner stated that he subsequently realized he was not going to get paid for the work he had done, so he stole two revolvers from the residence and hid them in the van. (Respondents' Exh. LL at 10, 19–21, 26–28) He denied any knowledge of the planned escape. Petitioner acknowledged his post-arrest statement to police that he had helped remove the van's rear seat but explained that he and Manning needed space to pick up construction materials. (Respondents' Exh. LL at 25–28) He also explained that he was in the area of the courthouse because he and Manning were on their way to a nearby elementary school to steal bicycles to "fence." (Id. at 11, 27–28, 30–32) He also testified that the bolt cutters would be used to steal the bikes. (Id.)

On January 26, 2001, a jury found Petitioner guilty of conspiracy to commit first degree murder (Count 1) and conspiracy to commit first degree escape (Count 2), but acquitted him of theft (Count 4). (Respondents' Exh. C: Minute Entry, dated 1/26/01) On April 6, 2001, the trial court sentenced Petitioner to life imprisonment with the possibility of parole after serving 25 calendar years on Count 1. (Respondents' Exh. NN: Tr. 4/6/01, at 11–12) The court also imposed an aggravated term of 7 years' imprisonment on Count 2, but noted that one of the sentences must be vacated on appellate review, pursuant to A.R. S. § 13–1003(C). (Id. at 12–14) The court explained that, although under A.R.S. § 13–1003(C), Petitioner could not properly be sentenced for both conspiracy to commit murder and conspiracy to commit escape in this case, the court would impose appropriate sentences on each count of conviction so the Court of Appeals would not have remand for resentencing if it vacated one of Petitioner's counts of conviction. (Respondents' Exh. NN at 12–13)

### B. Direct Appeal

Petitioner, through counsel, filed a timely notice of direct appeal. (Respondents' Exh. D) In his opening brief, Petitioner raised the following claims:

(1) The trial judge's failure to recuse himself violated the Arizona Rules of Criminal Procedure, the Rules of Judicial Conduct, and Petitioner's Fourteenth Amendment rights.

(2) The admission of non-conspirator England's testimony repeating Schilinski's account of the conspiracy violated

the Arizona Rules of Evidence and Petitioner's Fifth, Sixth and Fourteenth Amendment rights.

(3) The trial court erred in permitting Officer Coleman to refresh his memory regarding surveillance times, pursuant to Arizona Rule of Evidence 803(5), by reading from the surveillance log because no foundation existed.

(4) The admission of the Wal–Mart (ammunition) and Auto Zone (bolt cutters) receipts violated the Arizona Rules of Evidence and Petitioner's Fourteenth Amendment rights.

(5) The admission of England's testimony that Goldberg was a member of the Aryan Brotherhood violated Arizona Rule of Evidence 403 and Petitioner's Fourteenth Amendment rights.

(6) Testimony that Goldberg possessed $75,000 in unexplained currency violated Arizona Rule of Evidence 403 and Petitioner's Fourteenth Amendment rights.

(7) The evidence was insufficient to prove beyond a reasonable doubt that Petitioner had the specific intent to kill, as required for conspiracy to commit first degree murder, in violation of Petitioner's Fourteenth Amendment rights.

(8) The indictment was multiplicitous because it charged a single conspiracy in two counts in violation of the Fifth Amendment. [Ground V in pending petition]

(9) Sentencing Petitioner on both conspiracy to commit first-degree murder and conspiracy to commit first-degree escape violated A.R.S. 13–1003(C) and the Fifth Amendment.

(10) The trial court's denial of Petitioner's motion to continue trial to secure trial witnesses violated his Fifth, Sixth and Fourteenth Amendment rights.

(11) The trial court's denial of Petitioner's motion to vacate judgment violated his right to compulsory process guaranteed by the Fifth, Sixth and Fourteenth Amendments.

(Respondents' Exh. E)

On January 28, 2002, Petitioner filed a motion for leave to file a supplemental brief which the appellate court granted. (Respondents' Exhs. F, G) On February 13, 2002, Petitioner filed a supplemental brief raising the following issue, his twelfth ground for relief:

(12) The trial court erred in refusing to sever Petitioner's trial from the trial of co-defendants Manning and Eugene Cofsky because of the admission of a letter written by Manning to Cofsky which implicated Petitioner, in violation of the Sixth and Fourteenth Amendments, and Article 2, § 24 of the Arizona Constitution.

(Respondents' Exh. H) On April 29, 2002, Petitioner requested leave to file a second supplemental brief. (Respondents' Exh. I) On May 3, 2002, the appellate court granted this request, and allowed Petitioner until May 20, 2002 in which to file the second supplemental brief. (Respondents' Exh. J; Petitioner's Exh. B) On May 20, 2002, Petitioner filed a second supplemental brief raising his thirteenth issue on appeal—the trial court abused its discretion in failing to grant Petitioner's motion to suppress because the police lacked probable cause to arrest him. (Respondents' Exh. K; Petitioner's Exh. 11)

On August 15, 2002, the Arizona Court of Appeals rejected all but one of Petitioner's claims. (Respondents' Exh. L; Petitioner's Exh. C) The appellate court agreed with Petitioner that the indictment was multiplicitous because it charged a single conspiracy in two counts, in violation

of Arizona Revised Statute § 13–1003(C).[5] (*Id.* at 18–19) The court found that there was only one conspiracy and "that the most serious offense conspired to was first-degree murder." (Respondents' Exh. L at 19; Petitioner's Exh. C at 19) Accordingly, the appellate court affirmed Petitioner's conviction and sentence for conspiracy to commit first degree murder, and vacated Petitioner's conviction and sentence for conspiracy to commit escape, the less serious of the two convictions. (*Id.* at 19, 22.) The court noted that "[t]his action eliminates any prejudice defendant suffered from being convicted more than once for a single conspiracy and, consequently, this is the only relief to which defendant is entitled." (*Id.* at 19)

On September 16, 2002, Petitioner filed a petition for review in the Arizona Supreme Court raising issues involving sufficiency of the evidence (specific intent), the motion to suppress (probable cause to arrest), recusal of trial judge, the motion to sever (Manning letter), the multiplicitous indictment, and admission of sales receipts from Wal–Mart and Auto Zone. (*Id.*) On February 11, 2003, the Arizona Supreme Court denied review without comment. (Respondents' Exh. N; Petitioner's Exh. E)

## C. Post–Conviction Review

On March 12, 2003, Petitioner filed a notice of post-conviction relief. (Respondents' Exh. O) The court appointed counsel and in the subsequently filed petition for post-conviction relief, Petitioner raised the following claims:

A. The holding in *Evanchyck* [*Evanchyk*] *v. Stewart,* [202 Ariz. 476], 47 P.3d 1114 (Ariz.2002), that conspiracy to

commit first degree murder is a specific intent crime represents a significant change in the law that, if applicable to Petitioner's case, would probably overturn his conviction.

B. Trial counsel was ineffective based on the following grounds:

1. For failing to timely request a change of judge;

2. For failing to file a pre-trial motion to dismiss the multiplicitous indictment;

3. For failing to object to the admission of co-conspirator Schilinski's statements elicited through the testimony of witnesses Olsen and England because there was no evidence Petitioner was a member of the conspiracy;

4. For erroneously advising Petitioner that (1) his co-conspirator's statements could not be used to establish their contingency plan to kill a guard, and (2) that conspiracy to commit first degree murder could not be found based on conditional intent;

5. For failing to conduct adequate pretrial investigation;

6. For failing to request a proper instruction under *Richardson v. Marsh,* 481 U.S. 200 [107 S.Ct. 1702, 95 L.Ed.2d 176] (1987), regarding the Manning letter;

7. For failing to object to certain evidence at trial; and

8. For failing to request instructions on lesser-included offenses (conspiracy to commit aggravated assault, facilitation, or solicitation), an instruction that conspiracy to commit first degree murder requires the specific intent to

---

**5.** A.R.S. § 13–1003(C) (2001), states: "A person who conspires to commit a number of offenses is guilty of only one conspiracy if the multiple offenses are the object of the same agreement or relationship and the degree of the conspiracy shall be determined by the most serious offense conspired to."

commit murder, and a cautionary instruction regarding the pervasive police presence around the courthouse.

C. Appellate counsel was ineffective for the following reasons:

1. For failing to present facts, authority, and argument in the appellate brief regarding the trial judge's failure to recuse himself;

2. For omitting from the record on appeal transcripts of the hearing on co-defendant Sheri Cofsky's motion to preclude England's testimony regarding co-conspirator Schilinski's statements and for failing to argue that the condition precedent for admission of those statements did not exist;

3. For failing to present facts indicative of evidence adduced at trial that the Manning letter implicated Petitioner;

4. For failing to present facts and argument regarding why the trial court abused its discretion in denying Petitioner's motion to continue;

5. For failing to timely raise the issue of probable cause for Petitioner's arrest;

6. For failing to present facts and argument regarding the extent to which the multiplicitous indictment prejudiced Petitioner; and

7. For failing to file a motion to reconsider in the Court of Appeals based on *Evanchyck* [*Evanchyk* ].

(Respondents' Exh. P)

On September 29, 2004, Petitioner filed a supplemental petition for post-conviction relief, arguing that trial counsel was ineffective for failing to obtain evidence demonstrating that Petitioner was not a member of the conspiracy and for failing to submit such evidence to the trial court before it ruled on the motion *in limine* to preclude Schilinski's statements. (Respondents' Exh. Q; Petitioner's Exh. 6) Petitioner also argued that appellate counsel was ineffective for omitting from the record on appeal a transcript of the January, 2001 hearing in which the trial court ruled on a similar motion *in limine* filed by co-defendant Sheri Cofsky. (Respondents' Exh. Q at 2–3) Petitioner argued that had the transcript been prepared, it would have been "apparent" that there was no evidence that Petitioner was a member of the conspiracy. (*Id.*)

On January 7, 2005, the trial court denied Petitioner's petition for post-conviction relief finding that Petitioner "failed to present any claim raising a material issue of fact or law which would entitle him to relief under Rule 32," and that there was "no colorable claim for relief justifying the setting of an evidentiary hearing." (Respondents' Exh. R)

Thereafter, Petitioner filed a petition for review from the trial court's denial of post-conviction relief in the Arizona Court of Appeals. (Respondents' Exh. S) Petitioner again argued that *Evanchyk* constituted a significant change in the law which, if applied to his case, would probably have changed the outcome. (*Id.*) Petitioner also argued that counsel was ineffective based on his failure (1) to timely request a change of judge under Ariz. R.Crim.P. 10.1, (2) to move to dismiss the multiplicitous indictment prior to trial, (3) to object to the admission of Schilinski's statements, (4) to accurately advise Petitioner before rejecting the State's plea offer that he could be convicted of conspiracy to commit first degree murder based on conditional intent, (5) to interview witnesses prior to trial, (6) to request an adequate instruction under *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), (7) to request an instruction on the lesser-included offense of conspiracy to commit aggravated assault,

and (8) to object to Officer McNally's testimony that a "7" looked like a "T" in the Manning letter. (*Id.*) Petitioner did not raise his previously asserted claims that trial counsel was ineffective for (1) advising him prior to rejecting the State's plea offer that his co-conspirator's statements could not be admitted to show their plan to kill a guard if necessary, (2) failing to request instructions on the lesser-included offenses of facilitation and solicitation, an instruction that conspiracy to commit first degree murder requires a specific intent to commit murder, and a cautionary instruction regarding the pervasive police presence around the courthouse, and (3) failing to make any other evidentiary objections at trial. (*Id.*)

Petitioner also asserted claims of ineffective assistance of appellate counsel based on counsel's failure (1) to timely raise the issue that the trial court erred in denying Petitioner's motion to suppress because police lacked probable cause to arrest him, and (2) to include in the record on appeal a transcript of the January 3, 2001 hearing on co-defendant Sheri Cofsky's motion to preclude Schilinski's statements. (Respondents' Exh. S at 2–3) Petitioner did not raise any other claims of ineffective assistance of appellate counsel. (*Id.*)

On November 10, 2005, the Arizona Court of Appeals denied review without comment. (Respondents' Exh. T; Petitioner's Exh. 13) On December 10, 2005, Petitioner filed a petition for review in the Arizona Supreme Court raising the same claims he had raised in his petition for review to the Arizona Court of Appeals. (Respondents' Exh. U) The Arizona Supreme Court denied review without comment on May 23, 2006. (Respondents' Exh. V; Petitioner's Exh. 14)

### D. Federal Petition for Writ of Habeas Corpus

Thereafter, Petitioner timely filed the instant Petition for Writ of Habeas Corpus raising 24 claims for relief. (docket # 1) Respondents assert that all but two of these claims, Grounds IV and XI(A), are procedurally defaulted and barred from federal review because (1) Petitioner did not "fairly present" the federal constitutional claims "in each appropriate state court," and/or the state courts imposed a procedural bar to avoid reaching the merits; (2) a return to state court to present those claims would be futile because the state courts would find all of these claims procedurally barred; and (3) Petitioner has not established either "cause and prejudice" or a "fundamental miscarriage of justice" to excuse his failure to properly present these claims to the state courts. (docket # 13 at 17) Thus, Respondents assert that the Court should deny relief. Respondents further assert that the claims raised in Grounds IV and XI(A) lack merit. Petitioner disputes these assertions. (docket # 18) The Court will discuss the law regarding exhaustion, procedural bar, and the standard of review and will then apply that law to Petitioner's claims.

### II. Exhaustion and Procedural Bar

A federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted the state remedies available to him. 28 U.S.C. § 2254(b). When seeking habeas relief, petitioner bears the burden of showing that he has properly exhausted each claim. *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir.1981) (*per curiam*). The exhaustion inquiry focuses on the availability of state remedies at the time the petition for writ of habeas corpus is filed in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

The prisoner "shall not be deemed to have exhausted ... if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). In other words, proper exhaustion requires the prisoner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845, 119 S.Ct. 1728. "One complete round" includes filing a "petition[ ] for discretionary review when that review is part of the ordinary appellate review procedure in the State." *Id.* State prisoners may skip a procedure occasionally employed by a state's courts to provide relief only if a state law or rule precludes use of the procedure, or the "State has identified the procedure as outside the standard review process and has plainly said that it need not be sought for purposes of exhaustion." *Id.* at 848, 850, 119 S.Ct. 1728.

In this case, Respondents argue that because Petitioner, who received a sentence of life imprisonment, did not present several of his federal claims to the Arizona Supreme Court, those claims are unexhausted. Petitioner, on the other hand, argues that he properly exhausted his claims by presenting them to the Arizona Court of Appeals and that he was not required to seek review in the Arizona Supreme Court. (docket # 18) As discussed below, the Court agrees with Petitioner that he was not required to present his claims to the Arizona Supreme Court to satisfy the exhaustion requirement. Although the Court concludes that the exhaustion requirement did not require Petitioner to present his federal claims to the Arizona Supreme Court, he was still required to fairly present his claims to the Arizona Court of Appeals.

## A. Proper Forum

To exhaust state remedies, a petitioner must afford the state courts the opportunity to rule upon the merits of his federal claims by "fairly presenting" them to the state's "highest" court in a procedurally appropriate manner. *Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (stating that "[t]o provide the State with the necessary 'opportunity,' the prisoner must "fairly present" her claim in each appropriate state court ... thereby alerting the court to the federal nature of the claim."). Contrary to Respondents' assertion, in Arizona, unless a prisoner has been sentenced to death, the "highest court" requirement is satisfied if the petitioner has presented his federal claim to the Arizona Court of Appeals either on direct appeal or in a petition for post-conviction relief. *Crowell v. Knowles*, 483 F.Supp.2d 925 (D.Ariz.2007) (discussing *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir.1999)).

Relying on *Swoopes v. Sublett*, 196 F.3d 1008 (9th Cir.1999) and *Baldwin v. Reese*, 541 U.S. 27, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004), Respondents argue that to properly exhaust federal claims, a Petitioner, who received a life sentence is required to present those claims to the Arizona Supreme Court. (docket # 13) *Swoopes* does not support this assertion. Although less than a life sentence had been imposed in *Swoopes*, the Ninth Circuit broadly stated that "Arizona state prisoners need not appeal an Arizona Court of Appeals' denial of post-conviction relief to the Arizona Supreme Court in order to exhaust their state remedies for federal habeas corpus purposes, except in capital cases or cases involving the imposition of a life sentence." 196 F.3d at 1008. In support of this conclusion, *Swoopes* included undated cita-

tions to A.R.S. §§ 12–120.21(A)(1), 12–120.24, and 13–4031, and citations to Ariz. R.Crim.P. 31, *State v. Shattuck,* 140 Ariz. 582, 684 P.2d 154 (1984), *State v. Sandon,* 161 Ariz. 157, 777 P.2d 220 (1989), and *Moreno v. Gonzalez,* 192 Ariz. 131, 962 P.2d 205 (1998). *Swoopes,* 196 F.3d at 1009–10. As the court noted in *Crowell v. Knowles,* 483 F.Supp.2d 925, 930 (D.Ariz. 2007), "none of those authorities—either at the time of *Swoopes* or now—support the proposition that Arizona Supreme Court review remains part of the standard review process necessary for exhaustion in cases carrying *life sentences.*" *Id.* (emphasis in original). Rather, to the extent those authorities mentioned life imprisonment, it was in reference to outdated versions of A.R.S. § 12–120.21(A)(1) and 13–4031. In 1989, years before *Swoopes* was decided, A.R.S. § 12–120.21(A)(1) and § 13–4031 were amended to omit the phrase, "or life imprisonment." "The effect of this change was to give the Arizona Court of Appeals jurisdiction over criminal convictions carrying life sentences and eliminate Supreme Court's exclusive and mandatory jurisdiction." 483 F.Supp.2d at 928.

The erroneous statement of the law included in *dictum* in *Swoopes* was repeated in *dictum* in *Castillo v. McFadden,* 399 F.3d 993 (9th Cir.2005) and several district cases. *See, Crowell,* 483 F.Supp.2d at 930 and n. 4 (compiling cases). These cases, however, "present a tale of zombie precedent. A rule definitively extinguished by statutory amendment in 1989 continues to prowl, repeatedly re-animated by mistaken citation and dicta." *Id.* at 931.

Accordingly, in *Crowell,* the court found that "[s]ince 1989, the Arizona Supreme Court has not had exclusive appellate jurisdiction over cases carrying life sentences, and petitioners who have received a life sentence have not had a right to

State Supreme Court review." *Id.* The court went on to hold that:

> In sum, the language of *Swoopes* on life sentences was dictum unnecessary for the correct disposition of that case. The subsequent repetition of that dictum as dictum in other cases does not change its character. Nor do any of the dicta undercut the clarity of the pronouncement by the Arizona Supreme Court, together with the 1989 enactments of the Arizona Legislature, that discretionary review in non-capital cases is 'unavailable' for purposes of federal habeas exhaustion.

*Id.* at 933. The *Crowell* court found that petitioner, who had received a life sentence, had exhausted his claims by presenting them to the Arizona Court of Appeals. *Id.* The court further noted that support for its conclusion could be found in *Swoopes.* 483 F.Supp.2d at 933. "Applying *O'Sullivan,* *Swoopes* held that 'Arizona has declared that its complete round [of appellate review] does not include discretionary review before the Arizona Supreme Court.'" 483 F.Supp.2d at 933 (quoting *Swoopes,* 196 F.3d at 1010). Significantly, the *Crowell* court concluded that "there is no longer any basis for distinguishing among non-capital sentences under 28 U.S.C. § 2254(c) in light of the 1989 amendments to A.R.S. § 12–120.21(A)(1) and 13–4031." *Crowell,* 483 F.Supp.2d at 933.

In view of Arizona law, A.R.S. § 12–120.21(A)(1) and 13–4031, and the thorough and analytical discussion in *Crowell,* to properly exhaust his federal claims, Petitioner, who received a life sentence in this case, was not required to present his claims to the Arizona Supreme Court. Rather, the "highest court" requirement is satisfied by fair presentation to the Arizona Court of Appeals.

The Supreme Court's decision in *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) does not require a different conclusion. Respondents argue that pursuant to *Baldwin*, non-capital defendants must exhaust their claims in the Arizona Supreme Court. Respondents' argument hinges on the following language in *Baldwin*, "[t]o provide the State with the necessary 'opportunity,' [to rule on his claims] the prisoner must 'fairly present' his claim in each appropriate state court (*including a state supreme court with powers of discretionary review*), thereby alerting that court to the federal nature of the claim. *Duncan [v. Henry*, 513 U.S. 364], *supra*, at 365–366, 115 S.Ct. 887 [130 L.Ed.2d 865 (1995)]; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)." *Baldwin*, 541 U.S. at 29, 124 S.Ct. 1347 (emphasis added). Respondents latch onto a single phrase, "including a state supreme court with powers of discretionary review," to support their argument and ignore the basis for this statement. In *O'Sullivan*, the Supreme Court explained that proper exhaustion requires the prisoner to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845, 119 S.Ct. 1728. "One complete round" includes filing a "petition[ ] for discretionary review *when that review is part of the ordinary appellate review procedure in the State.*" *Id.* (emphasis added).

As previously stated, "Arizona has declared that its complete round [of appellate review] does not include discretionary re-

view before the Arizona Supreme Court." *Swoopes*, 196 F.3d at 1010.[6] Thus, contrary to Respondents' assertion, *Baldwin* does not require a non-capital prisoner in Arizona, such as Petitioner, to present his claims to the Arizona Supreme Court.

## B. Fair Presentation

 In addition to presenting his claims to the proper court, a state prisoner must fairly present his claims to that court to satisfy the exhaustion requirement. Fair presentation requires a petitioner to describe both the operative facts and the federal legal theory to the state courts. *Reese*, 541 U.S. at 28, 124 S.Ct. 1347. It is not enough that all of the facts necessary to support the federal claim were before the state court or that a "somewhat similar" state law claim was raised. *Reese*, 541 U.S. at 28, 124 S.Ct. 1347 (stating that a reference to ineffective assistance of counsel does not alert the court to federal nature of the claim). Rather, the habeas petitioner must cite in state court to the specific constitutional guarantee upon which he bases his claim in federal court. *Tamalini v. Stewart*, 249 F.3d 895, 898 (9th Cir.2001). Similarly, general appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish fair presentation of a federal constitutional claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir.2000), *amended on other grounds*, 247 F.3d 904 (9th Cir.2001); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir.2000) (insufficient for prisoner to have made "a general appeal to a constitutional guarantee," such as a naked reference to

---

**6.** In support of their assertion that discretionary review by the Arizona Supreme Court is part of the appeals process in Arizona, Respondents cite *State v. Ikirt*, 160 Ariz. 113, 117, 770 P.2d 1159, 1163 (1989). (docket # 13 at 18 n. 9) This case was decided before the April 1989 amendments to A.R.S. § 12–120.21(A)(1) and § 13–4031 which omitted the phrase "or life imprisonment" and effectively gave the Arizona Court of Appeals jurisdiction over criminal convictions carrying life sentences.

"due process," or to a "constitutional error" or a "fair trial"). Likewise, a mere reference to the "Constitution of the United States" does not preserve a federal claim. *Gray v. Netherland,* 518 U.S. 152, 162–63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). Even if the basis of a federal claim is "self-evident" or if the claim would be decided "on the same considerations" under state or federal law, the petitioner must make the federal nature of the claim "explicit either by citing federal law or the decision of the federal courts. . . ." *Lyons,* 232 F.3d at 668. A state prisoner does not fairly present a claim to the state court if the court must read beyond the pleadings filed in that court to discover the federal claim. *Baldwin,* 541 U.S. at 27, 124 S.Ct. 1347.

■■■ In sum, "a petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan,* 403 F.3d 657, 668 (9th Cir.2005) (citations omitted).

### C. Exhaustion and Procedural Bar

■■■ A habeas petitioner's claims may be precluded from federal review in either of two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds such as waiver or preclusion. *Ylst v. Nunnemaker,* 501 U.S. 797, 802–05, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Coleman v. Thompson,* 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Thus, a state prisoner may be barred from raising federal claims that he did not preserve in state court by making a contemporaneous objection at trial, on direct appeal, or when seeking

post-conviction relief. *Bonin v. Calderon,* 59 F.3d 815, 842 (9th Cir.1995) (stating that failure to raise contemporaneous objection to alleged violation of federal rights during state trial constitutes a procedural default of that issue); *Thomas v. Lewis,* 945 F.2d 1119, 1121 (9th Cir.1991) (finding claim procedurally defaulted where the Arizona Court of Appeals held that habeas petitioner had waived claims by failing to raise them on direct appeal or in first petition for post-conviction relief.) If the state court also addressed the merits of the underlying federal claim, the "alternative" ruling does not vitiate the independent state procedural bar. *Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Carriger v. Lewis,* 971 F.2d 329, 333 (9th Cir.1992) (state supreme court found ineffective assistance of counsel claims "barred under state law," but also discussed and rejected the claims on the merits, *en banc* court held that the "on-the-merits" discussion was an "alternative ruling" and the claims were procedurally defaulted and barred from federal review). A higher court's subsequent summary denial of review affirms the lower court's application of a procedural bar. *Nunnemaker,* 501 U.S. at 803, 111 S.Ct. 2590.

■■■ The second procedural default scenario arises when a state prisoner failed to present his federal claims to the state court, but returning to state court would be "futile" because the state courts' procedural rules, such as waiver or preclusion, would bar consideration of the previously unraised claims. *Teague v. Lane,* 489 U.S. 288, 297–99, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Beaty v. Stewart,* 303 F.3d 975, 987 (9th Cir.2002); *State v. Mata,* 185 Ariz. 319, 322–27, 916 P.2d 1035, 1048–53 (1996); Ariz. R.Crim. P. 32.2(a) & (b); Ariz. R.Crim. P. 32.1(a)(3) (post-conviction review is precluded for claims waived at

trial, on appeal, or in any previous collateral proceeding); 32.4(a); Ariz. R.Crim. P. 32.9 (stating that petition for review must be filed within thirty days of trial court's decision). A state post-conviction action is futile where it is time-barred. *Beaty,* 303 F.3d at 987; *Moreno v. Gonzalez,* 116 F.3d 409, 410 (9th Cir.1997) (recognizing untimeliness under Ariz. R.Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under Rule 32.2(a)). This type of procedural default is known as "technical" exhaustion because although the claim was not actually exhausted in state court, the petitioner no longer has an available state remedy. *Coleman,* 501 U.S. at 732, 111 S.Ct. 2546 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no remedies any longer 'available' to him.").

### D. Excusing Procedural Bar

■■■■ In either case of procedural default, federal review of the claim is barred absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Cook v. Schriro,* 516 F.3d 802, 827–29 (9th Cir.2008); *Dretke v. Haley,* 541 U.S. 386, 393–94, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004); *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2678, 91 L.Ed.2d 397 (1986). To establish "cause," a petitioner must establish that some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Id.* The following objective factors may constitute cause: (1) interference by state officials, (2) a showing that the factual or legal basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance of counsel. *Id.* Ordinarily, the ineffective assistance of counsel in collateral proceedings does not constitute cause because "the right to counsel does not extend to state collateral proceedings or federal habeas proceedings." *Martinez–Villareal v. Lewis,* 80 F.3d 1301, 1306 (9th Cir.1996).

■■■■ Prejudice is actual harm resulting from the constitutional violation or error. *Magby v. Wawrzaszek,* 741 F.2d 240, 244 (9th Cir.1984). To establish prejudice, a habeas petitioner bears the burden of demonstrating that the alleged constitutional violation "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimension." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Thomas v. Lewis,* 945 F.2d 1119, 1123 (9th Cir.1991). Where petitioner fails to establish cause, the court need not reach the prejudice prong.

■■■■ A federal court may also review the merits of a procedurally defaulted claim if petitioner demonstrates that failure to consider the merits of his claim will result in a "fundamental miscarriage of justice." *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). A "fundamental miscarriage of justice" occurs when a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Id.* To satisfy the "fundamental miscarriage of justice" standard, petitioner must establish that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt in light of new evidence. *Schlup,* 513 U.S. at 327, 115 S.Ct. 851; 28 U.S.C. § 2254(e)(2)(B). Even if petitioner asserts a claim of actual innocence to excuse his procedural default of a federal claim, federal habeas relief may not be granted absent a finding of an independent constitutional violation occurring in the state criminal proceedings. *Dretke,* 541 U.S. at 393–94, 124 S.Ct. 1847.

## III. Standard of Review

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA") which "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under the law." *Bell v. Cone*, 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

 Under the AEDPA, a state prisoner "whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)." *Price v. Vincent*, 538 U.S. 634, 638, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003). Thus, a state prisoner is not entitled to relief unless he demonstrates that the state court's adjudication of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2); *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Lockyer v. Andrade*, 538 U.S. 63, 75–76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir.2006). To determine whether a state court ruling was "contrary to" or involved an "unreasonable application" of federal law, courts must look exclusively to the holdings of the Supreme Court which existed at the time of the state court's decision. *Mitchell v. Esparza*, 540 U.S. 12, 15–15, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003); *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003). Accordingly, the Ninth Circuit has acknowledged that it cannot reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on a federal constitutional issue. *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir.2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

 Even if the state court neither explained its ruling nor cites United States Supreme Court authority, the reviewing federal court must nevertheless examine Supreme Court precedent to determine whether the state court reasonably applied federal law. *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2003). The United States Supreme Court has expressly held that citation to federal law is not required and that compliance with the habeas statute "does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*

 A state court's decision is "contrary to" federal law if it applies a rule of law "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v. Esparza*, 540 U.S. 12, 14, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (citations omitted); *Williams v. Taylor*, 529 U.S. 362, 411, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

 A state court decision involves an "unreasonable application of" federal law if the court identifies the correct legal rule, but unreasonably applies the rule to the facts of a particular case. *Williams*, 529 U.S. at 405, 120 S.Ct. 1495; *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 161 L.Ed.2d 334 (2005). An incorrect application of federal law does not satisfy this standard. *Yarborough v. Alvarado*, 541 U.S. 652, 665–66, 124 S.Ct. 2140, 158

L.Ed.2d 938 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable.") "It is not enough that a federal habeas court, in its independent review of the legal question," is left with the "firm conviction" that the state court ruling was "erroneous." *Id.*; *Andrade*, 538 U.S. at 75, 123 S.Ct. 1166. Rather, the petitioner must establish that the state court decision is "objectively unreasonable." *Middleton v. McNeil*, 541 U.S. 433, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004); *Andrade*, 538 U.S. at 76, 123 S.Ct. 1166.

■■■■■ Where a state court decision is deemed to be "contrary to" or an "unreasonable application of" clearly established federal law, the reviewing court must next determine whether it resulted in constitutional error. *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th Cir.2002). Habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). In § 2254 proceedings, the federal court must assess the prejudicial impact of a constitutional error in a state-court criminal proceeding under *Brecht's* more forgiving "substantial and injurious effect" standard, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Fry v. Pliler*, 551 U.S. 112, 127 S.Ct. 2321, 2328, 168 L.Ed.2d 16 (2007). The *Brecht* harmless error analysis also applies to habeas review of a sentencing error. The test is whether such error had a "substantial and injurious effect" on the sentence. *Calderon v. Coleman*, 525 U.S. 141, 145–47, 119 S.Ct. 500, 142 L.Ed.2d 521 (1998) (holding that for habe-

as relief to be granted based on constitutional error in capital penalty phase, error must have had substantial and injurious effect on the jury's verdict in the penalty phase.); *Hernandez v. LaMarque*, 2006 WL 2411441 (N.D.Cal., Aug. 18, 2006) (finding that even if the evidence of three of petitioner's prior convictions was insufficient, petitioner was not prejudiced by the court's consideration of those convictions because the trial court found four other prior convictions which would have supported petitioner's sentence.) The Court will review Petitioner's claims that are properly before it under the applicable standard of review.

## IV. Analysis of Petitioner's Claims

Petitioner presents 24 grounds for relief in his Petition for Writ of Habeas Corpus. (docket # 1) Below, the Court will determine whether Petitioner has satisfied the exhaustion requirement and, where appropriate, consider the merits of Petitioner's claims that are properly before the Court.

### A. Ground One—Sufficiency of the Evidence

In Ground I, Petitioner alleges that his conviction violates the Fourteenth Amendment because there was insufficient evidence to prove that he and his co-conspirators intended to cause the death of another person. (docket # 1 at 15)

### 1. Exhaustion and Procedural Bar

■■■■ Respondents assert that Petitioner's Fourteenth Amendment claim raised in Ground One is unexhausted and procedurally barred because Petitioner did not raise that claim in "each appropriate state court," including the state trial court. (docket # 13) Petitioner disputes this assertion. Respondents correctly assert that although Petitioner challenged the sufficiency of the evidence in his motions pur-

suant to Rules 20 and 24 of the Arizona Rules of Criminal Procedure for judgment of acquittal and for a new trial, he did not raise a federal claim in either motion. (Respondents' Exh. W, Rule 20 Motion for Judgment of Acquittal; Exh. X, Rule 24 Motion for New Trial; Petitioner's Exhs. X, Y) Although Petitioner's mere failure to raise his federal claim to the trial court did not result in a procedural default of that claim, he also failed to raise a federal claim to the Arizona Court of Appeals.

On direct appeal, Petitioner argued that his conviction of conspiracy to commit first-degree murder violated the Fourteenth Amendment because neither he nor any of his coconspirators expressed an intent to kill. Rather, at most, co-conspirator Schilinski had conditional intent to kill if necessary. (Respondents' Exh. E at 32–34) Although Petitioner referred to the Fourteenth Amendment, his argument relied almost exclusively on state law cases from courts in North Carolina and Ohio. (Respondents' Exh. E at 32–34) (citing *State v. Irwin*, 55 N.C.App. 305, 285 S.E.2d 345 (N.C.1982) and *State v. Kinnemore*, 34 Ohio App.2d 39, 295 N.E.2d 680 (1972)). Petitioner cited a single federal case, *Payne v. Janasz*, 711 F.2d 1305 (6th Cir.1983), for the proposition that, under the Fourteenth Amendment, a criminal defendant cannot be convicted except upon proof beyond a reasonable doubt. (Respondents' Exh. E at 34)

Petitioner's mere citations to the Fourteenth Amendment is not sufficient to exhaust a federal claim, *Reese*, 541 U.S. at 28, 124 S.Ct. 1347. General appeals to broad constitutional principles, such as due process, equal protection, and the right to a fair trial, are insufficient to establish fair presentation of a federal constitutional claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir.2000). Petitioner's mere citation to the Fourteenth Amendment on di-

rect appeal was not sufficient to exhaust a federal claim. The body of Petitioner's argument plainly asserted a state-law challenge to the elements necessary to prove conspiracy to commit first-degree murder under Arizona law. (Respondents' Exh. E at 32–34) Moreover, the Arizona Court of Appeals found that Petitioner's claim failed because the state cases upon which he relied expressed a minority view that conditional intent is insufficient to support a *mens rea* for conspiracy to commit first-degree murder. (Petitioner's Exh. C at 14–15; Respondents' Exh. L at 14–15) The appellate court concluded that "the better view" was expressed in *Holloway v. United States*, 526 U.S. 1, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999), where the Supreme Court found that conditional intent satisfied the intent requirement in the federal car jacking statute. In so holding, the Court of Appeals relied on the Supreme Court's statement in *Holloway* that "a defendant may not negate a proscribed intent by requiring a victim to comply with a condition he has no right to impose; an intent to kill, in the alternative, is nevertheless, an intent to kill." (Petitioner's Exh. C at 16; Respondents' Exh. L at 16) (quoting *Holloway*, 526 U.S. at 9, 119 S.Ct. 966). Although the Court of Appeals considered a United States Supreme Court case in resolving Petitioner's claim, it relied on *Holloway* only to analogize Arizona's statutes governing conspiracy to commit first-degree murder to the federal car jacking statute. (*Id.*) *Holloway* did not involve a Fourteenth Amendment challenge and the citation to that case did not convert Petitioner's state law claim into a federal claim. Accordingly, Petitioner's Fourteenth Amendment claim asserted in Ground I is unexhausted and, as discussed in Section V, *infra*, procedurally barred.

### 2. Merits Analysis—Ground One

Alternatively, even if Petitioner's Fourteenth Amendment claim raised in Ground

I were properly before this Court, it fails on the merits. Petitioner argues that the evidence presented at trial "demonstrated there was never an agreement between any conspirator to commit the offense of murder" and, therefore, the State failed to prove the "statutory requirements" beyond a reasonable doubt and his conviction for conspiracy to commit first degree murder violates the Fourteenth Amendment. (docket # 1 at 5) The elements necessary to prove conspiracy to commit first-degree murder under Arizona law are central to the resolution of Ground One.[7]

In June 2000, Petitioner was charged with conspiracy to commit first degree murder, pursuant to A.R.S. §§ 13–1003 and 13–1105. (Respondents' Exh. A) Under A.R.S. § 13–1105 (2000), a person commits first degree murder if "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another with premeditation." A person commits conspiracy if, "with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another." A.R.S. § 13–1003.

At the time of Petitioner's trial (December 2000–January 2001), first degree murder under A.R.S. § 13–1105 was considered a "specific intent" crime, requiring the specific intent to kill another person. *See State v. Murray,* 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher,* 176

Ariz. 69, 79, 859 P.2d 179, 189 (1993); *see generally* A.R.S. § 13–1105. At that time, Arizona courts had not addressed whether "conditional" intent was sufficient to satisfy the *mens rea* of a "specific" intent crime. Other states that had addressed the issue were split. *Compare, e.g., State v. Irwin,* 55 N.C.App. 305, 285 S.E.2d 345, 349 (N.C.1982) and *State v. Kinnemore,* 34 Ohio App.2d 39, 295 N.E.2d 680, 681–83 (1972) (both holding that conditional intent not sufficient to satisfy *mens rea* for specific intent crime assault with the intent to kill); with *Holloway v. United States,* 526 U.S. 1, 9–11, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (holding that conditional intent sufficient to satisfy specific intent *mens rea* in federal car jacking statute); *People v. Vandelinder,* 192 Mich.App. 447, 481 N.W.2d 787, 788–89 (Mich.1992) (holding that conditional intent sufficient to satisfy specific intent *mens rea* for solicitation to commit murder offense).

The Arizona Court of Appeals relied on *Holloway* and *Vandelinder* to hold that Petitioner's claim failed because conditional intent was sufficient to establish the *mens rea* for conspiracy to commit first degree murder. (Petitioner's Exh. C) Petitioner argues that the Arizona Court of Appeals's decision "involved an unreasonable application of federal law by extending the principle in *Holloway v. United States* to a new context in a way that was objectively unreasonable to the facts and evidence of the instant case." (docket # 18 at 19) Petitioner also argues that he is entitled to habeas corpus relief, because the Arizona Court of Appeals' decision was

---

**7.** In his reply, Petitioner attempts to re-cast his first ground for relief as a challenge to the jury instructions. He claims that the Arizona Court of Appeals' decision "added a new element" to the crime and that the jury, rather than an appellate judge, was required to find the "existence of each element of the charged offense beyond a reasonable doubt." (docket # 18 at 21) This claim was never presented to the state courts on post-conviction review and, therefore, is unexhausted and not properly before this Court.

"contrary to the Arizona Supreme Court's ruling in *Evanchyk*." (docket # 18 at 16)

As an initial matter, with respect to his claim based *Evanchyk v. Stewart*, 202 Ariz. 476, 47 P.3d 1114 (Ariz.2002), Petitioner incorrectly states that the standard of review applicable to § 2254 petitions involves whether the State court correctly applied State law. The correct standard is whether the state court's adjudication of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established *Federal law*, as determined by the Supreme Court of the United States," not state law. *See* 28 U.S.C. § 2254(d)(1),(2). To the extent that Petitioner challenges the application of state law, his claim is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Moreover, Petitioner's claim fails. Petitioner asserts that the Arizona Supreme Court's decision in *Evanchyk*, 202 Ariz. 476, 47 P.3d 1114 (2002), which was decided while Petitioner's direct appeal was pending, constitutes a significant change in the law which would probably have changed the outcome of his case. In *Evanchyk*, the Arizona Supreme Court considered whether a defendant could be convicted of conspiracy to commit first-degree murder based on an allegation that he conspired to commit the crime under a felony-murder theory, as opposed to a theory of premeditation. *Id.* The Arizona Supreme Court held that defendant could not be convicted of first-degree murder under such a theory. The Arizona Supreme Court affirmed that a defendant can be guilty of conspiracy to commit first-degree murder if he intended to kill or promote or aid in the killing and made an agreement to kill. *Id.* In reaching this conclusion, the Arizona Supreme Court relied on Arizona Court of Appeals' decisions as old as 1981.

Petitioner is correct that *Evanchyk* announced a new rule of law to the extent that it held that a conviction to commit first degree murder based solely on a felony-murder theory was invalid. However, *Evanchyk* does not apply to Petitioner's case because he was not convicted under a theory of felony-murder. Rather, the jury was only instructed on a theory of premeditation. (Respondents' Exh. MM at 8–10)

Moreover, the statement in *Evanchyk* that conspiring to commit first degree murder is a specific intent crime in Arizona was not new law. Rather, at the time of Petitioner's trial (December 2000–January 2001), first degree murder under § 13–1105 was considered a "specific intent" crime, requiring the specific intent to kill another person. *See State v. Murray*, 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher*, 176 Ariz. 69, 79, 859 P.2d 179, 189 (1993); *see generally* A.R.S. § 13–1105. The trial court instructed the jury that first-degree murder required that one act intentionally or knowingly and with premeditation. (Respondents' Exh. MM at 8–10) *Evanchyk* did not require a different jury instruction.

Petitioner's claim that the appellate court unreasonably applied *Holloway* also fails. In rejecting Petitioner's Fourteenth Amendment challenge, the appellate court cited *Holloway v. United States*, 526 U.S. 1, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999), where the Supreme Court found that conditional intent satisfied the intent requirement in the federal car-jacking statute. The Court of Appeals specifically relied on the Supreme Court's statement in *Holloway* that "a defendant may not negate a proscribed intent by requiring a victim to comply with a condition he has no right to

impose; an intent to kill, in the alternative, is nevertheless, an intent to kill." (Petitioner's Exh. C at 16) (quoting *Holloway*, 526 U.S. at 9, 119 S.Ct. 966). The Court of Appeals did not unreasonably draw an analogy between Arizona's statutes governing conspiracy to commit first-degree murder and the federal car-jacking statute. Both statutes required the defendant to have the requisite intent to commit the crime. The *Holloway* Court's statement that "a defendant may not negate a proscribed intent by requiring a victim to comply with a condition he has no right to impose; an intent to kill, in the alternative, is nevertheless, an intent to kill," *Holloway*, 526 U.S. at 9, 119 S.Ct. 966, was reasonably applied to Petitioner's case.

Petitioner's first ground for relief fails because Petitioner has not established that the state court's resolution of that claim was contrary to or resulted in an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1),(2).

## B. Ground II—Fourth Amendment Violation

In Ground II, Petitioner argues that his conviction violates the Fourth Amendment because police lacked "probable cause to arrest and subsequently search[8] the vehicle" in which Petitioner was a passenger. (docket # 1 at 6, docket # 18 at 24–42) Therefore, he argues, the trial court erred in failing to suppress physical evidence seized from the minivan—handguns, ammunition, rubber gloves. (*Id.*) As discussed below, Petitioner's Fourth Amendment claims is not cognizable on § 2254 review.

■ When the State provides an opportunity for full and fair litigation of a fourth amendment claim, such a claim is not cognizable in federal habeas proceedings. *Stone v. Powell*, 428 U.S. 465, 481–82, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *Villafuerte v. Stewart*, 111 F.3d 616, 627 (9th Cir.1997); *Siripongs v. Calderon*, 35 F.3d 1308, 1321 (9th Cir.1994); *Mitchell v. Goldsmith*, 878 F.2d 319, 323 (9th Cir. 1989); *Caldwell v. Cupp*, 781 F.2d 714, 715 (9th Cir.1986). *Stone* only requires the initial opportunity for a full and fair hearing. *Caldwell*, 781 F.2d at 715. "Such an opportunity for a fair hearing forecloses this court's inquiry, upon habeas corpus petition, into the trial court's subsequent course of action." *Caldwell*, 781 F.2d at 715.

■ The record reflects that the State provided an opportunity for full and fair litigation of Petitioner's claim that police lacked probable cause to arrest him and, therefore, evidence seized from the van should have been suppressed. On July 31, 2000, Petitioner moved to suppress the evidence found in the van alleging that his arrest was "unsupported by probable cause." (Petitioner's Exh. 11; Respondents' Exh. Y) On September 14, 2000, the trial court conducted a suppression hearing. (Petitioner's Exh. 11; Respondents' Exh. OO) After the suppression hearing, the trial court denied the motion to suppress, concluding that sufficient probable cause existed to arrest Petitioner. (*Id.* at 65–70) Because the State provided a full, fair hearing on the issue of probable cause and the admissibility of the evidence seized in the search on the van, habeas corpus relief is not available on Fourth Amendment grounds. *Stone*, 428 U.S. at 481–82, 96 S.Ct. 3037; *Siripongs*, 35 F.3d at 1321.

---

**8.** To the extent that Petitioner asserts a separate Fourth Amendment violation based on the search of the vehicle, such a claim is procedurally barred from habeas review because Petitioner never presented this claim to the State courts. (*see* Respondents' Exhs. K, M, Y); *Noltie v. Peterson*, 9 F.3d 802, 804 (9th Cir.1993).

██ Moreover, even if Petitioner's Fourth Amendment claim were cognizable on federal habeas review, it is procedurally defaulted. Although Petitioner fairly presented a Fourth Amendment claim based on lack of probable cause to arrest to the trial court in his motion to suppress (Respondents' Exh. Y), Petitioner failed to properly present this claim to the Arizona Court of Appeals. Petitioner did not raise a Fourth Amendment claim in his opening brief on direct appeal. (Respondents' Exh. E) Rather, Petitioner raised a Fourth Amendment claim in his second supplemental appellate brief. (Respondents' Exh. K; Petitioner's Exhs. A, 11) The Arizona Court of Appeals, however, declined to address the issue on procedural grounds, holding that the second supplemental brief was not authorized by Arizona Rule of Civil Appellate Procedure 13. (Respondents' Exh. L at 6; Petitioner's Exh. C at 6) The State court's assertion of a procedural bar precludes federal review of Petitioner's Fourth Amendment claim. *See Nunnemaker*, 501 U.S. at 802–05, 111 S.Ct. 2590; *Insyxiengmay*, 403 F.3d at 665.

## C. Ground III—Recusal

██ In Ground III, Petitioner argues the refusal of the Honorable Steven F. Conn to recuse himself from Petitioner's trial violated his Fourteenth Amendment rights to a fair trial and due process. (docket # 1 at 7) Specifically, Petitioner contends that Judge Conn should have recused himself because: (1) he received "extra-judicial disputed evidentiary facts" before Petitioner's trial which suggested that he and his court staff "could have been harmed," which resulted in prejudicial rulings against Petitioner;[9] (2) he was a "ma-

terial witness to critical facts of [Petitioner's] case;" and (3) he ordered the "sudden presence of heightened law enforcement that put fear in the defense counsel and the jury." (docket # 1 at 7)

Respondents argue that Petitioner's factual allegations regarding the heightened presence of law enforcement, were never presented to the State courts, and therefore, such allegations are procedurally defaulted. The Court agrees. Petitioner never presented his claim based on the increased presence of law enforcement to the state courts either on direct appeal or collateral proceedings. Accordingly, federal habeas review of those assertions is procedurally barred. *See Gauf v. Ontiveres*, No. CV–06–804–PHX–DGC (JCG), 2007 WL 1713287, *5 (D.Ariz. June 12, 2007) (noting that presentation of one set of operative facts in support of a federal claim does not properly exhaust the same federal claim based on a different set of facts).

Respondents further argue that Petitioner failed to exhaust his other two factual theories underlying his Fourteenth Amendment challenge to Judge Conn's failure to recuse himself because he failed to present those claims to the Arizona Supreme Court on direct review. (docket # 13) As discussed above, Petitioner was not required to present his federal claims to the Arizona Supreme Court, *see* Section II. A., *supra*. The Court finds that Petitioner properly exhausted his claims that the Judge Conn should have recused himself because (1) he received "extra-judicial" information before Petitioner's trial indicating that he and his court staff "could have been harmed," which resulted in prejudicial rulings against Petitioner; and (2) he was a "material witness to critical facts

---

9. Judge Conn was assigned to preside over Goldberg's change of plea hearing on June 12, 2000, and received advance notice of the

planned jailbreak. (Respondents' Exh. KK, Tr. 1/19/0101, at 186.)

of [Petitioner's] case by presenting those claims to the Arizona Court of Appeals." [10] (Respondents' Exh. E)

■ On the first day of trial, Petitioner moved for a change of judge for cause, alleging that "DEFENDANT aboved [sic] has recieved [sic] State's disclosure, after many, many attempts, from his former counsel, in which Judge Steven Conn has been mentioned by name alleging some unwilling participation." (Respondents' Exh. Z; Petitioner's Exh. P) Petitioner did not cite any legal authority in support of his motion. (*Id.*) The trial judge, the Honorable Steven F. Conn, analyzed the motion pursuant to Ariz.R.Crim.P. 10.1 which governed motions for change of judge for cause. (Respondents' Exh. B, Petitioner's Exh. Q) Judge Conn denied the motion as "untimely" under Ariz.R.Crim.P. 10.1 and further noted that the basis for the motion was "so vague as to defy being able to be addressed in any way." (Respondents' Exh. B; Petitioner's Exh. Q)

On direct appeal, Petitioner asserted that Judge Conn should have recused himself because it is "logical to infer" that he would not have been impartial based on his knowledge that the conspirators had attempted to help Goldberg escape from his courtroom, and because Judge Conn was a potential witness based on his observation of the Cofskys entering his courtroom on the morning of the planned escape. (Respondents' Exh. E at 41–42; Exh. L at 7) The Arizona Court of Appeals rejected these claims noting that "[n]o specific facts were alleged in" Petitioner's motion for change of judge, and that the motion was "properly denied [ ] on that basis." (Respondents' Exh. L at 7) Because Petitioner had not raised the specific claims he as-

serted on appeal to the trial court, the Arizona Court of Appeals reviewed those new claims for fundamental error, and concluded they were "not supported [ ] with citations to any evidence in the record," and were "clearly unreasonable." (*Id.* at ¶ 15) The appellate court found "no merit" to Petitioner's contention that Judge Conn should have recused himself. (*Id.*)

The Court of Appeals' fundamental error review is sufficient to exhaust Petitioner's challenge to Judge Conn's failure to recuse himself because the court specifically identified which claims it was reviewing. *Poland v. Stewart,* 117 F.3d 1094, 1105–06 (9th Cir.1997); *Moormann v. Schriro,* 426 F.3d 1044, 1057 (9th Cir.2005) (holding that a claim is considered exhausted by Arizona's fundamental error review if it was explicitly noted in the briefs presented to the state appellate court, or the state court mentions it is considering the claim *sua sponte.*)

■ Regardless, Petitioner's recusal claim fails on the merits. "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do no constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Havey v. Hubbard,* 2001 WL 793281, *5 (N.D.Cal.2001). The determination of judicial bias is a factual question to which the federal courts defer on habeas review. *See* 28 U.S.C. § 2254(d); *Villafuerte v. Stewart,* 111 F.3d 616, 632 (9th Cir.1997) (stating that state court's finding of lack of judicial bias was entitled to a presumption of correctness.)

---

10. In his Reply, Petitioner greatly expands his recusal claim. (docket # 18 at 42–53) The Court will only address those claims previously described which Petitioner properly pre-

sented to the State courts. Petitioner's attempt to expand his claim in his Reply is insufficient to exhaust a claim.

Petitioner argues that Judge Conn's refusal to recuse himself violated his right to a fair trial because Judge Conn was a material witness to the events. (docket # 18 at 42) In support of this claim, Petitioner states that co-conspirators Eugene and Sheri Cofsky were present in Judge Conn's courtroom on June 12, 2000 and that they were acting suspiciously. (docket # 18 at 42) Petitioner further states that in a subsequent evidentiary hearing, Judge Conn testified that he had not noticed whether the Cofskys were acting suspiciously while in his courtroom on June 12, 2000. (docket # 18 at 42) (Tr. 8/22/03 at 31) Petitioner further argues that law enforcement officials had informed Judge Conn that they were not bringing Goldberg to his courtroom on June 12, 2000 because of the planned escape attempt. Thus, Judge Conn was aware of the conspirators plan to help Goldberg escape and that he and his staff were at risk of harm because "gun play" could be involved. (docket # 18 at 43–44)

Petitioner contends that Judge Conn's prior knowledge of the planned escape attempt resulted in biased rulings and impartiality towards the State's witness, Sandra Brice, his court reporter. (docket # 18 at 44–45) Petitioner explains that during this trial Brice testified that Goldberg and the Cofskys were scheduled to appear on June 12, 2000 before Judge Conn. (docket # 18 at 45) Petitioner claims that after Brice testified, Judge Conn addressed Brice regarding her independent duties as a court reporter, corroborated her testimony, and vouched for her. (docket # 18 at 45) Petitioner further claims that Judge Conn made biased rulings against him. (docket # 18 at 48) Specifically, Petitioner contends that Judge Conn "coached the State on how to get around the objections by the defense." (*Id.*) He further argues that Judge Conn refused to instruct the jury accurately. (*Id.*)

Even if Judge Conn made rulings during trial which were unfavorable to Petitioner, bias can "almost never" be demonstrated solely on the basis of a judicial ruling. *Liteky v. United States*, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Rather, a judge's remarks or opinions will not demonstrate bias unless they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.*

Petitioner claims that the Arizona Court of Appeals incorrectly applied the standard set forth in Arizona Rule of Supreme Court, 81, Arizona Code of Judicial Conduct, Canon 3(E)(1)(a), and (d)(iv). (docket # 18 at 51) He further argues that the Arizona Court of Appeals unreasonably applied Arizona Code of Professional Conduct in determining that Judge Conn was not biased. To the extent that Petitioner challenges that Court of Appeals' application of state law, his claim is not cognizable on federal habeas corpus review. *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (explaining that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

Petitioner further argues that he was denied a fair trial because Judge Conn was impartial based on his knowledge of events giving rise to Petitioner's case. Most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). "Rather, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar." *Bracy v. Gramley*, 520 U.S. 899, 904, 117 S.Ct. 1793,

138 L.Ed.2d 97 (1997) (citing *Aetna,* 475 U.S. at 820–821, 106 S.Ct. 1580, *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927); 28 U.S.C. §§ 144, 455; ABA Code of Judicial Conduct, Canon 3C(1)(a) (1980)). However, "the floor established by the Due Process Clause requires a 'fair trial in a fair tribunal' ... before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy,* 520 U.S at 904–05, 117 S.Ct. 1793 (citations omitted). *See also, In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). To succeed on a judicial bias claim, however, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). Of course, "most matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC v. Cement Inst.,* 333 U.S. 683, 702, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (citation omitted). The Supreme Court has stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Petitioner has offered no evidence to overcome the "presumption of honesty and integrity" that is accorded the determinations of a judge. *Withrow,* 421 U.S. at 47, 95 S.Ct. 1456. Although Judge Conn had knowledge of the planned escape attempt, there is no evidence that this knowledge resulted in "deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

Petitioner has not established that the Arizona Court of Appeals' conclusion that Judge Conn did not err in declining to recuse himself, was contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## D. Ground IV—Confrontation Clause

In Ground IV, Petitioner alleges a violation of his Sixth Amendment right to confrontation based on the trial court's denial of Petitioner's motion to sever his trial from that of co-defendant Manning and then by admitting into evidence a letter that Manning had written to co-defendant Eugene Cofsky which detailed a story they could use to explain their actions.[11] (Respondents' Exh. CC: Trial Exhibit 2) Petitioner claims that the letter "linked [him] to the conspiracy," and, therefore, should not have been admitted at his trial because Manning did not testify. (docket # 1 at 8) Petitioner presented this claim to the Arizona Court of Appeals on direct review. (Respondents' Exh. H) The appellate court denied relief and the Arizona Supreme Court affirmed that decision. (Respondents' Exh. L) Respondents concede that this claim is properly before this court. (docket # 13 at 38, 41)

As discussed below, Petitioner has not shown that the state court's determination was contrary to, or an unreasonable application of clearly established federal law, as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts in light of the

---

**11.** Correction officers discovered the letter hidden in the cuff of Cofsky's pants after transporting him back to jail following a court appearance on July 31, 2000. (Respondents' Exh. FF, Tr. 1/10/01, at 205–08)

evidence presented at trial. *See* 28 U.S.C. § 2254(d). Therefore, Petitioner is not entitled to federal habeas relief on this claim.

Petitioner's claim is based on the admission into evidence of the following letter written by co-defendant Manning which read:

E.C. This is how its gonna go, and I don't give a fuck if you like it or not.

David [Goldberg] called you, told you a buddy of his Dennis [Schilinski] was getting out and to use the van, he goes to Vegas to get it and gets busted, gets out comes by bus back to Kingman "if under servalance (sic) is seen picked up by me & Sheri [Cofsky]" comes out helps Rich & I witch ditches "Feds got pictures."

Dennis takes van to wherever he lives, brings van back on 10th your (sic) in Vegas, ask me to bring van to town on 12th around 9:30. I say sure. While Im (sic) washing van I find pistols, put in house 7 & 7 show up on 11th. He has bags full of stuff ready at Walmart and wants to steal bi[ke]s also. I tell him he can shoot 38 but have to replace ammo since [ ] there (sic) not ours, 7 puts guns back in car. We come to town to get bikes, bags and go to court. We were gonna leave van around 12:30 or whenever we were done with van. We were going by school w/side of jail for bike check and to buy heroin when pulled over, look E.C. we were under servalance (sic) from at least the 8th think about it Bro this story may need work but its (sic) the right one. Your (sic) the one who needs to slow down, and get your lawyer to get your dates back with ours E.C. you had a reason to be here you may have a good case but until you show me a better defense this is the one Im (sic) going with. So either show me or get with it.

RLM

(Respondents' Exhs. BB; Exh. CC, Exhibit A)

Before trial, Petitioner moved to sever his trial from that of co-defendant Manning. (Respondents' Exh. CC) Petitioner anticipated that the State would introduce Manning's letter at trial to show collusion between Manning and Cofsky. (Respondents' Exh. CC) Petitioner was concerned that the State would "endeavor to demonstrate ... that the '7 & 7' or '7' referred to therein is, in fact, Defendant Tracy Date." (Respondents' Exh. CC at 2) Petitioner argued that the letter was inadmissible against him under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) where the United States Supreme Court held that a confession of a non-testifying co-defendant which inculpates another defendant is inadmissible at their joint trial. 391 U.S. at 135–37, 88 S.Ct. 1620. (Respondents' Exh. CC at 3) Following a hearing, the trial court denied Petitioner's motion to sever. Petitioner and Manning were tried together. (Respondents' Exh. DD, 10/11/00 minute entry)

As Petitioner had anticipated, Manning's letter was admitted in evidence at Petitioner's trial. (Respondents' Exh. FF at 207–08) The State called Detective Randy McNally of the Mohave County Sheriff's Office to testify regarding the letter. The prosecutor asked Officer McNally whether the letter "T" in the word "This" at the beginning of the letter and the number "7" in the phrase "7 and 7" "look the same." (Respondents' Exh. JJ at 77–79) Detective McNally testified that they did, and that the phrase "7 and 7" "[c]ould be" " 'T' and 'T'." (*Id.*) The trial court also admitted in evidence a second letter authored by Manning containing the letter "T" as an exemplar. (Respondents' Exh. JJ at 81–83; Exh. KK at 2–6; Exh. LL at 67–68) Manning did not testify at Petitioner's trial.

On direct appeal, Petitioner argued that the trial court's admission of the Manning letter violated *Bruton* and its progeny. (Respondents' Exh. H at 4–15) As previously stated, in *Bruton*, the Supreme Court held that a confession of a non-testifying co-defendant which inculpates another defendant is inadmissible at their joint trial. 391 U.S. at 135–37, 88 S.Ct. 1620. In *Marsh*, the United States Supreme Court created an exception to the *Bruton* rule. *Marsh*, 481 U.S. at 208–11, 107 S.Ct. 1702. The *Marsh* Court held that admission of a non-testifying co-defendant's confession does not violate the Confrontation Clause when the confession is redacted to eliminate the defendant's name and any reference to his existence, and the trial court instructs the jury not to use the confession against the defendant. *Marsh*, 481 U.S. at 208–11, 107 S.Ct. 1702. Petitioner argued on appeal that his right to confrontation was violated because the trial court admitted Manning's letter and then failed to instruct the jury not to consider the letter's inculpatory statements against him. (Respondents' Exh. H at 13–15)

The Arizona Court of Appeals agreed and found that the trial court's limiting instruction [12] "was confusing in that it appear[ed] to have applied only to the exemplar, not the substantive statement. Thus, the *Marsh* requirements were not completely satisfied." (Respondents' Exh. L at 21; Exh. MM: Tr. 1/24/01 at 12–15)

The appellate court concluded that any error was harmless and that reversal was not required because the "letter on its face did not directly implicate [Petitioner] in the propagation of or participation in the cover-up scenario," and "[t]he other evidence of the conspiracy and [Petitioner's] participation in it was substantial." (Respondents' Exh. L at 21) Therefore, the appellate court concluded that "we are able to say beyond a reasonable doubt that the trial court's failure to properly instruct the jury pursuant to *Marsh* did not affect the verdict against [Petitioner]." (*Id.*)

Respondents assert that the State court's harmlessness finding was neither contrary to, nor an unreasonable application, of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence. (docket # 13 at 44) The Court agrees.

A state court's decision is "contrary to" clearly established federal law under § 2254(d)(1) if it "applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases." *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495. A state court's application of clearly established Supreme Court law is "unreasonable" where the state court identifies the correct governing legal principal but unreasonably applies that principle to the facts of the particular case in an "objectively" unreasonable manner. *Andrade*, 538 U.S. at 75, 123 S.Ct. 1166; *Woodford v. Visciotti*, 537 U.S. 19, 27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). Petitioner concedes that the Court of Appeals identified the correct governing federal law, *Bruton* and *Marsh*, but argues that the appellate court applied those cases unreasonably. (docket # 18 at 54–63) The Court disagrees with Petitioner's assertion and finds that the State court's decision is nei-

---

**12.** The trial instructed the jury that: "A letter alleged to have been written by Defendant Manning has been introduced in evidence in this case. Such letter was introduced and may be considered only for the limited purpose of comparing the handwriting with that of the other letter whose authorship has not been established. You are not to consider in any manner the actual content or meaning of such letter." (Respondents' Exh. MM at 15)

ther contrary to federal law nor rests on an unreasonable application of federal law.

The United States Supreme Court has held that a *Bruton* violation does not automatically require reversal, but rather is subject to harmless-error review. *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). *See also United States v. Sutton*, 794 F.2d 1415, 1428 (9th Cir.1986); *United States v. Steed*, 465 F.2d 1310, 1318 (9th Cir.1972). In *Schneble*, the Court stated that, "[i]n some cases the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Id.* at 405 U.S. at 430, 92 S.Ct. 1056.

Consistent with controlling United States Supreme Court precedent, the Arizona Court of Appeals recognized that the *Bruton* error in Petitioner's case did not automatically require reversal, but could be considered harmless when "[t]he other evidence of the conspiracy and [Petitioner's] participation in it was substantial," and that it could "say beyond a reasonable doubt that the trial court's failure to properly instruct the jury pursuant to *Marsh* did not affect the verdict against [Petitioner]." (Respondents' Exh. L at 21) Accordingly, the state court's determination was not contrary to, or an unreasonable application of, clearly established federal law.

Additionally, the appellate court's determination was not based on an unreasonable determination of the facts in light of the evidence presented at trial. *See* § 2254(d)(1). The Manning letter neither directly implicated Petitioner nor confessed his guilt. Rather, it merely articulated a story to explain the conspirators' actions in defense to the charged offenses. Additionally, the State presented the following

evidence of Petitioner's guilt. Both Robert Olsen and Daniel England testified at length about their conversations with Goldberg and Schilinski, and their plan to help Goldberg escape. (Respondents' Exh. FF at 89–124, 163–64; Exh. GG at 7–94) Olsen and England specifically mentioned Schilinski, the Cofsky's, and Manning as being participants in the planned escape. (*Id.*) Olsen and England further testified regarding the details of the plan which Goldberg and Schilinski had described to them. (*Id.*) The escape attempt was planned for June 12, 2000, at 11:30 a.m., when Goldberg was being transported from the courthouse to the jail. Upon Goldberg's arrival, "two" people in a van with sliding doors were going to drive by and "grab" Goldberg. (*Id.*) If the guard escorting Goldberg interfered with the escape attempt, Schilinski was to kill the guard. (*Id.*) Once Goldberg was inside the van, the conspirators would "cut off" Goldberg's chains, and Goldberg would "change his clothes," before being driven to another "waiting" vehicle, where they would "switch" cars. (*Id.*)

Petitioner's role in the conspiracy became clear when law enforcement officers, who were conducting surveillance of the Cofsky residence, observed the arrival of Petitioner and co-defendant Tawanee Barrett at the Cofsky residence the night before the planned jailbreak. (Respondents' Exh. HH at 130–35; Exh. JJ at 56–58; Exh. LL at 4–7) The next morning, June 12, 2000, Petitioner, Barrett, and conspirator Manning drove to Wal–Mart and purchased .38 caliber ammunition. (Respondents' Exh. HH at 143–49, 167–70; Exh. II at 245–48; Exh. JJ at 19–23; Exh. LL at 22–25) They proceeded to Auto Zone, and purchased a pair of 18–inch bolt cutters. (*Id.*) At approximately 11:00 a.m., officers observed Petitioner, Barrett, Manning, and the Cofsky's drive towards Kingman

in three different vehicles. (Respondents' Exh. GG at 185–90; Exh. HH at 150–53, 177) Officers followed the vehicles into Kingman, and saw them drive to an old warehouse parking lot, where Petitioner and Manning removed the back seat of the minivan, and "stash[ed]" it behind the building. (Respondents' Exh. GG at 195, 154–55; Exh. II at 140; Exh. JJ at 76; Exh. LL at 30) After driving to another location where Barrett remained with one of the vehicles, Petitioner and Manning left in the minivan, and drove towards the courthouse. (Respondents' Exh. GG at 161–63; Exh. II at 118–19, 125–26; Exh. JJ at 59–64; Exh. LL at 30–31) Meanwhile, police observed Schilinski and the Cofskys "casing" the courthouse and jail. (Respondents' Exh. HH at 18–35, 74–75; Exh. II at 25–31, 120–24, 181–83, 190, 238–41; Exh. JJ at 61–62) After arresting the Cofskys, police found, among other items, a day planner in Sheri Cofsky's purse which contained Schilinski's name, social security number, and date of birth, Manning's name and phone number, and the name, "Tracy" (Petitioner), with a corresponding number. (*Id.*)

When police officers outside of the courthouse observed the minivan drive "right in front" of the courthouse, they initiated a traffic stop. (Respondents' Exh. GG at 160–61, 193; Exh. II at 125–32, 242–43; Exh. JJ at 62–69) Manning was in the driver's seat, and Petitioner was crouched in the "back cargo area" of the van wearing "reflective sunglasses," had seven .38 caliber rounds of ammunition in his pocket, and was holding six more rounds in his hand. (Respondents' Exh. II at 41–42, 129–32, 244; Exhibit JJ at 66)

Officers found two handguns in the van, one loaded with two .38 caliber rounds of ammunition, and a pair of worn surgical gloves. (Respondents' Exh. II at 132–35, 172–81; Exh. JJ at 67) Inside the vehicle which Barrett was driving when she was arrested, police found: (1) two pairs of bolt cutters; (2) five .38 caliber rounds of ammunition; (3) a pair of rubber gloves similar to the pair found in the minivan; (4) a bag containing "extra large" men's clothing and a can of shaving cream (Goldberg weighed approximately 260 pounds, and had a beard (Tr. 1/18/01, at 73)); (5) cell phones; (6) two license plates; and (7) a court document bearing Eugene Cofsky's name. (Respondents' Exh. II at 143–162, 223; Exh. JJ at 70–73, 87)

At the Cofsky's residence, officers found $117,500 in cash, .38 caliber shell casings, and a receipt from Wal–Mart for .38 caliber ammunition purchased on June 12, 2000 at 10:20 a.m. (Respondents' Exh. GG at 196–98; Exh. HH at 37–41, 161–70) Police also found a document with Eugene Cofsky's name and the notation, "left Fourth, end, park van, white Grand Am," apparent driving directions to the courthouse for Petitioner and Manning.[13] (*Id.*) Finally, a telephone calling card taken from Schilinski after his arrest indicated that he called the Cofsky residence at 8:28 a.m. on June 12, 2000 when Petitioner was there. (Respondents' Exh. HH at 166; Exh. II at 48, 184–85)

During his interview, Petitioner told police that: (1) he had been at the Cofsky residence on the morning of June 12, 2000; (2) he helped Manning remove the back seat of the minivan; (3) the ammunition

---

13. The minivan was seen driving north on Fourth Street towards the courthouse. (Respondents' Exh. II at 125; Exh. JJ at 62–63) The courthouse is located at the intersection of Fourth Street and Spring Street. (*Id.*) The minivan turned east on Spring Street and then north on Fifth Street, which borders the courthouse's east side. (*Id.*) The minivan then drove through the intersection of Pine Street, and then made a U-turn back towards the courthouse before being stopped. (*Id.*)

found in his pocket matched the ammunition loaded in the handgun that police found in the minivan; and (4) he "handled" at least one of the handguns found in the minivan. (Respondents' Exh. II at 40–47; Exh. JJ at 30–33) When asked why he and Manning removed the seat from the van, Petitioner became "upset and agitated" and "no longer wanted to speak after that." (Id.)

The evidence at trial was sufficient to establish that a conspiracy to commit first-degree murder existed and that Petitioner was a participant in that conspiracy. As the Court of Appeals found, in view of this evidence, the jury "would not have found the State's case significantly less persuasive had the [Manning letter] been excluded." Schneble, 405 U.S. at 432, 92 S.Ct. 1056. Assuming that "7 and 7" referred to "T" or Petitioner, the Manning letter merely set forth that one possible defense to the charges was for the co-defendants to claim that Petitioner "showed up" and wanted to steal bikes and that he put guns in the car. (Respondents' Exhs. BB, CC) Petitioner himself testified that he was in the area of the courthouse on the day in question because he had planned to steal bikes from a nearby elementary school. (Respondents' Exh. LL at 11, 27–28, 30–32) In view of the evidence at trial, including Petitioner's testimony, any prejudicial effect of the Manning letter is so "insignificant by comparison" to the evidence of Petitioner's involvement in the crime, that the Arizona Court of Appeals properly concluded that admission of the letter was harmless error. Id. at 430, 92 S.Ct. 1056. Petitioner has not established that the State Court's resolution of his confrontation clause claim was based on an unrea-sonable determination of the facts in light of the evidence or an unreasonable application of federal law.

**E. Ground V—Double Jeopardy**

In Ground V, Petitioner argues that his Fifth Amendment "right against double jeopardy" was violated because he was indicted on two separate counts of conspiracy, conspiracy to commit first degree murder and conspiracy to commit first degree escape, "when the evidence demonstrated there was only one conspiracy." (docket # 1 at 9)

Respondents argue that Petitioner's Fifth Amendment challenge to the indictment is procedurally defaulted because he did not raise a challenge to the indictment before trial.[14] (docket # 13) Petitioner's failure to raise a pretrial challenge to the indictment itself resulted in a waiver of that claim under Arizona Law. See, Ariz. R.Crim. P. 13.5, 16.1(b), (c); accord State v. Anderson, 210 Ariz. 327, 335–36, 111 P.3d 369 (2005) (precluding a defendant from challenging an indictment as duplicitous where an objection had been made during, but not before, trial). However, contrary to Respondents' argument, Petitioner's failure to object to the multiplicitous indictment at trial did not waive a double jeopardy objection to imposition of multiple sentences. See Launius, 575 F.2d at 772. As discussed below, however, Petitioner is not entitled to relief on his Fifth Amendment claim because he has already been afforded the appropriate relief.

On direct appeal, Petitioner argued that the indictment was multiplicitous because

---

14. Respondents further argue that Petitioner's claims are procedurally defaulted because he did not raise them before the Arizona Supreme Court. (docket # 13) As previously stated, Petitioner was not required to present any of his federal claims to the Arizona Supreme Court. Rather, for purposes of § 2254, an Arizona prisoner in a non-capital case, exhausts his claims by presenting them to the Arizona Court of Appeals.

it included "two counts of A.R.S. § 13–1003 for one conspiracy." (Respondents' Exh. E at 35) He further argued that "Judge Conn sentencing [Petitioner] for conspiracy to commit first degree murder and conspiracy to commit escape in the first degree, even though concurrently, violated A.R.S. § 13–1003(C) and [his] Fifth Amendment Rights." (Respondents' Exh. E at 37)

The appellate court specifically addressed Petitioner's challenge to the multiplicitous indictment. Although the appellate court did not specifically mention Petitioner's Fifth Amendment challenge, it construed Petitioner's argument as alleging that "his convictions and sentences for both conspiracies cannot stand." (Petitioner's Exh. C at 18–19) The Court of Appeals agreed with Petitioner's assertion that the indictment was multiplicitous. (Petitioner's Exh. C at 18) In so finding the court explained that under Arizona law, it is the agreement to commit an offense which is punished by the conspiracy statute. (Petitioner's Exh. C at 18)

Arizona Revised Statute § 13–1003(C) (2001) provided that:

> A person who conspires to commit a number of offenses is guilty of only one conspiracy if the multiple offense are the object of the same agreement or relationship and the degree of the conspiracy shall be determined by the most serious offense conspired to.

(Respondents' Exh. L at 18; Petitioner's Exh. C at 18) (citing A.R.S. § 13–1003(C) (2001)). Whether there are separate conspiracies to commit multiple offenses is a question of fact. The Court of Appeals concluded that the evidence made it "abundantly clear that there was only one conspiracy in this case, and that the most-serious offense conspired to was first-degree murder." (Petitioner's Exh. C at 19) The Arizona Court of Appeals, therefore,

vacated the less serious of the two convictions, conspiracy to commit escape, and the related sentence. (Id.) The court concluded that "this action eliminates any prejudice [Petitioner] suffered from being convicted more than once for a single conspiracy and, consequently, this is the only relief to which [Petitioner] is entitled." (Id.)

On review before the Arizona Supreme Court, Petitioner argued that he was prejudiced by the multiplicitous indictment and that the Court of Appeals order vacating his conviction and sentence for conspiracy to commit escape did not cure that prejudice. (Respondents' Exh. M at 9–10) Petitioner, however, did not raise a Fifth Amendment claim before the Arizona Supreme Court. (Id.) Additionally, the cases which Petitioner cited in support of his prejudice claims did not address the issue on Fifth Amendment grounds. (Respondents' Exh. M at 9–10) The Arizona Supreme Court summarily denied review. (Petitioner's Exh. E) Accordingly, the Arizona Court of Appeals' decision is the last reasoned decision of the State courts regarding Petitioner's Fifth Amendment claim. As discussed below, Petitioner has not shown that the Arizona Court of Appeals' decision is contrary to or involved an unreasonable application of federal law.

 Even if Petitioner's challenge to the indictment itself were properly before this Court, that claim does not entitle Petitioner to habeas corpus relief. "An indictment is multiplicitous when it charges multiple counts for a single offense, producing two penalties for one crime and thus raising double jeopardy questions." *United States v. Stewart*, 420 F.3d 1007, 1012 (9th Cir.2005). Multiplicity is a defect in the indictment; therefore, a conviction will not be reversed unless the defendant was prejudiced. *See United States v. Severino*, 316 F.3d 939, 943 (9th

Cir.2003). Here, although the indictment was multiplicitous, any prejudice Petitioner may have suffered was cured when the Arizona Court of Appeals vacated Petitioner's conviction and sentence on conspiracy to commit escape. *See, United States v. Davenport*, 519 F.3d 940 (9th Cir.2008) (finding that offense of possessing child pornography was lesser included offense of receipt of child pornography, and thus entering judgment against defendant on separate counts for receiving child pornography and possessing child pornography was multiplicitous, in violation of Fifth Amendment's prohibition of double jeopardy and remanding to the district court to vacate defendant's conviction on one of the two counts and allowing that it be reinstated without prejudice if his other conviction should be overturned on direct or collateral review).

Petitioner also argues that, under the Fifth Amendment's double jeopardy clause, he cannot be subject to multiple punishment on multiplicitous charges. In support of this claim, Petitioner cites *Braverman v. United States*, in which the Supreme Court stated that "one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.... The single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute.... For such a violation, only the single penalty prescribed by the statute can be imposed." *Braverman*, 317 U.S. 49, 53–54, 63 S.Ct. 99, 87 L.Ed. 23 (1942); *see also United States v. Licciardi*, 30 F.3d 1127, 1131 (9th Cir.1994) (holding that indictment is multiplicitous if it charges multiple conspiracies when there is only a single conspiracy to violate two statutes); *Launius v. United States*, 575 F.2d 770, 771 (9th Cir.1978) (*per curiam*) (holding that consecutive sentences imposed on multiplicitous counts—two counts

of conspiracy for one drug smuggling enterprise—violated Double Jeopardy Clause).

In this case, the Court of Appeals found that the evidence made it "abundantly clear that there was only one conspiracy in this case, and that the most-serious offense conspired to was first-degree murder." (Respondents' Exh. L at 19; Petitioner's Exh. C at 19) The Arizona Court of Appeals, therefore, vacated the less serious of the two convictions, conspiracy to commit escape, and the related sentence. (*Id.*)

In accordance with United States Supreme Court precedent, the Ninth Circuit recognizes that when a defendant has been convicted and sentenced on mulitiplicitous charges, "[t]he conviction as well as the sentence on one of the two mulitiplicitous counts must be vacated, to 'avoid both the punitive collateral effects of multiple convictions as well as the direct effects of multiple sentences.'" *United States v. Alerta*, 96 F.3d 1230, 1239 (9th Cir.1996), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000) (quoting *United States v. Anderson*, 850 F.2d 563, 569 (9th Cir.1988) and quoting *United States v. Palafox*, 764 F.2d 558, 564 (9th Cir.1985)); *see also Rutledge v. United States*, 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) (holding that "[a] guilty verdict on a § 848 charge necessarily includes a finding that the defendant also participated in a conspiracy violative of § 846; conspiracy is therefore a lesser included offense .... we adhere to the presumption that Congress intended to authorize only one punishment. Accordingly, 'one of [petitioner's] convictions, as well as its concurrent sentence, is unauthorized punishment for a separate offense' and must be vacated.") (internal citation omitted).

Here, because the Arizona Court of Appeal already vacated one of Petitioner's convictions and the related sentence, he has been afforded the relief to which he is entitled and, therefore, is not entitled to further relief based on his challenges to the indictment.

### F. Ground VI—Fourteenth Amendment

In Ground VI, Petitioner argues that the trial court violated the Fourteenth Amendment by admitting into evidence sales receipts from Wal–Mart and Auto Zone. At trial, however, Petitioner only objected to the admission of the Wal–Mart receipt on "relevance" and "hearsay" grounds, and to the admission of the Auto Zone receipt on "foundation" grounds. (Tr. 1/12/01, at 168–69; Tr. 1/17/01, at 245–48) *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (state evidentiary rulings not cognizable in federal habeas proceedings). Petitioner never objected on constitutional grounds. Petitioner raised the instant federal constitutional claim for the first time in his opening brief to the Arizona Court of Appeals (Respondents' Exh. E at 25). However, Petitioner merely referred to the Fourteenth Amendment, but cited to the Arizona Rules of Evidence and to Arizona and other state-court case law in support of his claim. (Respondents' Exh. E at 25–28) The Arizona Court of Appeals resolved the claim on the basis of state law. (Respondents' Exh. L at 11–12) The appellate court ruled that the two sales receipts did not meet the requirements for admission as business records under Ariz. R.Evid. 803(6). (Respondents' Exh. L at 11) However, the appellate court found that admission of the receipts was harmless error. Petitioner contended that the sales receipts were crucial to the State's ability to connect him to the conspiracy. (Respondents' Exh. L at 12) The appellate court rejected this contention concluding that the "critical evidence was the ammunition and the bold cutter themselves. These were the items necessary to carry the plan to fruition, not receipts evidencing their purchase. And defendant was caught red-handed in actual or constructive possession of these items." (Respondents' Exh. L at 12)

Similarly, although Petitioner argued in his petition for review to the Arizona Supreme Court that "[b]ut for the receipts [Petitioner] had a viable mere presence defense that would have changed the verdict," he did not assert a Fourteenth Amendment constitutional violation. (Respondents' Exh. M) Petitioner cited to Arizona and other state cases in support of his claim. (*See Id.* at 7) (citing *State v. Denman,* 186 Ariz. 390, 392, 923 P.2d 856, 858 (Ariz.App.1996) (discussing whether there was sufficient evidence to support defendant's conspiracy to commit murder conviction); and *Dickeson v. State,* 843 P.2d 606, 607–12 (Wyo.1992) (discussing whether defendant's counsel was ineffective)). *See Casey v. Moore,* 386 F.3d 896, 912 n. 12 (9th Cir.2004) (state appellate judges not required to read all cases that are cited in the cases on which a petitioner relies).

The record reveals that, although Petitioner mentioned the Fourteenth Amendment on direct appeal, he presented a state law claim which was resolved on state-law grounds. Petitioner's mere reference to the Fourteenth Amendment was insufficient to fairly present a federal claim. *See Shumway v. Payne,* 223 F.3d 982, 987 (9th Cir.2000); *Gray v. Netherland,* 518 U.S. 152, 162–63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). Consequently, Petitioner did not properly exhaust a federal claim in state court. *See Reese,* 541 U.S. at 32, 124 S.Ct. 1347. And, as dis-

cussed in Section V, *infra*, that claim is procedurally barred.

■ Moreover, Petitioner has not shown that the Arizona Court of Appeals decision is contrary to, or an unreasonable application of, federal law or based on an unreasonable determination of the facts. Even if admission of the sales receipts into evidence would have violated federal law, Petitioner is not entitled to habeas corpus relief on that basis. As the appellate court found, the bolt cutters and ammunition were found in Petitioner's "actual or constructive possession" and linked him to the conspiracy. Police found the bolt cutters in the Mountaineer which they had observed Petitioner driving a short time before the bolt cutters were found in the vehicle. (Respondents' Exh. GG at 160–61, 167,185–194; Exh. HH at 150–53, 177; Exh. II at 129–32, 223, 244; Exh. LL at 29–30, 45–46; Exh. JJ at 70–73, 87) Moreover, Petitioner himself testified that he had accompanied Manning to Auto Zone to purchase bolt cutters, but claimed that they were for use in constructing a fence. (Respondents' Exh. LL at 24–25)

When police arrested Petitioner, he had seven rounds of .38 ammunition in his pocket, and was holding six more rounds in his hand. (Respondents' Exh. II at 41–42, 131; Exh. JJ at 66) In the van in which Petitioner was riding at the time of his arrest, police found an additional two rounds of .38 ammunition. (Respondents' Exh. II at 132–35, 172–81; Exh. JJ at 67).

As the Court of Appeals found, the sales receipts themselves were not the sole evidence tying Petitioner to the ammunition and the bolt cutters. Petitioner has not shown that the State court's rejection of his claim based on the admission of the sales receipts is contrary to, or rests on an unreasonable application of, federal law, or that it rests on an unreasonable determination of the facts. Accordingly, Petition-

er is not entitled to habeas corpus relief based on his Fourteenth Amendment claim.

**G. Grounds VII, XI(B), XIV(A), (B), (D), (E), XV(B), (C), (D), (E), XVII, XVIII(B), XIX, XX, XXII, and XXIII–Ineffective Assistance of Counsel**

■ Petitioner asserts several claims of ineffective assistance of trial counsel:

**Ground VII:** trial counsel failed to file a "motion to reconsider" in the Arizona Court of Appeals based on the Arizona Supreme Court's decision in *Evanchyk*;

**Ground XI(B):** trial counsel erroneously advised Petitioner that Schilinski's and Goldberg's statements "could [not] be used against [him] at trial";

**Ground XIV:** **(A)** trial counsel failed to object to Olsen's "speculative" testimony "as to why he felt Goldberg and Schilinski weren't just bragging about shooting a guard, his response to letter written to Cathy Ambrosio [Olsen's drug therapy counselor], and Olsen's vouching for the credibility of the conspirator statements";

**(B)** trial counsel "failed to object to Officer Reif's speculation about Schilinski's demeanor";

**(D)** trial counsel "failed to object to Olsen's testimony that he was concerned they were going to kill guard"; and

**(E)** trial counsel "failed to object or request anything from the judge regarding the overwhelming show of force by law enforcement at the close of the State's evidence at the end of the trial";

**Ground XV:** trial counsel failed to request jury instructions on **(B)** the lesser included offenses of "solicitation and facilitation"; **(C)** a cautionary instruction on the "overwhelming police presence at the close of trial"; **(D)** "specific intent";

and **(E)** "co-conspirator liability" in Arizona.

(docket # 1 at 11–19)

Petitioner also argues that he was denied his Sixth Amendment right to effective assistance of appellate counsel based on the following:

**Ground XVII:** appellate counsel "failed to articulate facts, reasons and authority for the contention in the appellate brief argument section of [his] appeal" that the trial judge should have recused himself;

**Ground XVIII(B):** appellate counsel "failed to argue that the condition precedent for admission of the [Schilinski] statements did not exist";

**Ground XIX:** appellate counsel "failed to adequately present the factual record indicative of evidence adduced at trial that the letter authored by co-defendant Manning did, in fact, directly implicate [Petitioner]";

**Ground XX:** appellate counsel "failed to properly present facts and argument as to why the denial of a motion to continue amounted to an abuse of discretion in violation of the Fourteenth Amendment";

**Ground XXII:** appellate counsel "failed to adequately present facts and argument regarding the extent to which the multiplicitous indictment prejudiced [Petitioner]," and "failed to properly distinguish the facts of *Ward v. United States*";

**Ground XXIII:** appellate counsel failed to file a "motion to reconsider" in the Arizona Court of Appeals based on the Arizona Supreme Court's holding in *Evanchyk.*

(docket # 1 at 21–27)

Although Petitioner raised these Sixth Amendment claims before the trial court in his petition for post-conviction relief (Re-spondents' Exh. P), he did not raise them in his petition for review to the Arizona Court of Appeals. (Respondents' Exhs. S and U.) Consequently, Grounds VII, XI(B), XIV(A), (B), (D), (E), and XV(B), (C), (D), (E), XVII, XVIII(B), XIX, XX, XXII, and XXIII were not properly exhausted in state court. *See Reese,* 541 U.S. at 32, 124 S.Ct. 1347; *Boerckel,* 526 U.S. at 845, 119 S.Ct. 1728; *Galvan v. Alaska Dep't. of Corrections,* 397 F.3d 1198, 1204 (9th Cir.2005) (noting that failure to cite *Strickland* or Sixth Amendment indicates that petitioner elected to make his claim under state, rather than federal, law.) And, as discussed below in Section V, these claims are barred from federal habeas corpus review.

## H. Grounds VIII, IX, X, XII, XIII, XIV(C), XV(A), XVIII(A), and XXI

Petitioner also argues he was denied his Sixth Amendment right to effective assistance of trial counsel based on the following:

**Ground VIII:** trial counsel failed to timely request a change of judge;

**Ground IX:** trial counsel failed to object to the multiplicitous indictment;

**Ground X:** trial counsel failed to object to the admission of Schilinski statements on the grounds that Petitioner was not a member of the conspiracy;

**Ground XII:** trial counsel "failed to interview witnesses prior to trial";

**Ground XIII:** trial counsel "failed to request an adequate instruction pursuant to *Richardson v. Marsh*";

**Ground XIV(C):** trial counsel "failed to object to officer McNally's testimony that "7 and 7" could mean "T and T" in the Manning letter";

**Ground XV(A):** trial counsel failed to request a jury instruction on the lesser

included offense of conspiracy to commit aggravated assault;

**Ground XVIII(A):** appellate counsel failed to include the transcript of co-defendant Sheri Cofsky's hearing (1/3/01) on her motion to preclude England's testimony regarding Schilinski's statements;

**Ground XXI:** appellate counsel failed to timely present the probable cause issue to the Arizona Court of Appeals.

(docket # 1 at 12–19, 22, 25) Although Petitioner raised these Sixth Amendment claims before the trial court in his petition for post-conviction relief (Respondents' Exh. P), he did not present them as Sixth Amendment claims on review to the Arizona Court of Appeals. (Respondents' Exh. S) Petitioner neither asserted a Sixth Amendment violation, nor cited any case law involving the legal standard for a Sixth Amendment ineffective assistance of counsel claim. (*Id.*) Rather, Petitioner merely argued that the trial court "abused its discretion" in denying relief, that its rulings were "erroneous," or that he was "entitled" to an evidentiary hearing. (*Id.* at 6, 7, 8, 9, 10) Petitioner merely asserted that trial and appellate counsel were "ineffective." Such allegations were not sufficient to fairly present a Sixth Amendment claim to the state courts. *See Galvan,* 397 F.3d at 1204 (no fair presentment where petitioner's brief did not state that she was "deprived of her Sixth Amendment right to the assistance of counsel.") The Ninth Circuit has explained that:

> Briefing a case is not like writing a poem, where the message may be conveyed entirely through allusions and connotations.... If a party wants a state court to decide whether she was deprived of a federal constitutional right, she has to say so. It has to be clear from the petition filed at each level in the state court system that the peti-

tioner is claiming the violation of the federal constitution that the petitioner subsequently claims in the federal habeas petition. That is, 'the prisoner must fairly present his claim in each appropriate state court ... thereby alerting that court to the federal nature of claim.' If she does not say so, then she does not 'fairly present' the federal claim to the state court.

*Galvan,* 397 F.3d 1198, 1204 (9th Cir.2005) (citing *Baldwin,* 541 U.S. at 29–32, 124 S.Ct. 1347). See *Baldwin,* 541 U.S. at 29–32, 124 S.Ct. 1347 (holding that habeas petitioner failed to "fairly present" a claim of ineffective assistance of counsel by merely labeling counsel's performance as "ineffective," without any accompanying reference to federal law or to a citation to an opinion applying federal law); *Lyons,* 232 F.3d at 668–70 (mere reference to "ineffective assistance of counsel" is not sufficient to fairly present a Sixth Amendment claim).

Additionally, the Arizona Court of Appeals was not required to review the petition for post-conviction relief which Petitioner had filed in the trial court to determine whether he was raising a federal claim. *See Castillo,* 399 F.3d at 1000 ("[T]he Arizona Court of Appeals was not required to review the parties' trial court pleadings to see if it could discover for itself a federal, constitutional issue."). Such requirements would "force state appellate judges to alter their ordinary review practices," and "impose a serious burden upon judges of state appellate courts." *Reese,* 541 U.S. at 31, 124 S.Ct. 1347. Consequently, Grounds VIII, IX, X, XII, XIII, XIV(C), XV(A), XVIII(A), and XXI were not properly exhausted in state court. *See Reese,* 541 U.S. at 32, 124 S.Ct. 1347; *Boerckel,* 526 U.S. at 845, 119 S.Ct. 1728. As discussed in Section V, *infra,*

those claims are barred from federal habeas corpus review.

## I. Ground XVI—Sixth Amendment Right to Counsel

In Ground XVI, Petitioner argues that his Sixth Amendment right to effective assistance of trial counsel was violated because trial counsel "failed to contact Schilinski prior to trial to demonstrate [Petitioner] was not a member" of the conspiracy. (docket # 1 at 20)

Petitioner did not properly exhaust this claim because he did not present this particular claim of ineffective assistance in the state courts. *Carriger,* 971 F.2d at 333–34; *Pappageorge v. Sumner,* 688 F.2d 1294 (9th Cir.1982). Ineffective assistance claims different from those presented to the state courts are precluded from consideration on habeas corpus review. *Martinez–Villareal v. Lewis,* 80 F.3d 1301, 1305–06 (9th Cir.1996); *Pappageorge,* 688 F.2d at 1294. In his supplemental petition for post-conviction relief, Petitioner argued that trial counsel was ineffective for failing to obtain evidence that Petitioner was not a member of the conspiracy and for failing to submit that evidence to the trial court before it ruled on the motion *in limine* to preclude Schilinski's statements. (Respondents' Exh. Q) Petitioner explained that: "Trial counsel at no time attempted to contact Schilinski to see what his testimony would be as to who was a member of the conspiracy." (*Id.* at 1–2) Petitioner, however, did not allege a Sixth Amendment violation, did not cite the United States Constitution, and did not cite any federal or state case law involving the legal standard for a Sixth Amendment ineffective assistance of counsel claim. (Respondents' Exh. Q) *See Castillo,* 399 F.3d at 999. Petitioner merely alleged that trial counsel was "ineffective." (*Id.*) This was not sufficient to present a federal constitutional claim to the state court. *See Reese,* 541 U.S. at 29–32, 124 S.Ct. 1347; *Lyons,* 232 F.3d at 668–70; *Galvan,* 397 F.3d at 1204.

Additionally, in his petitions for review to the Arizona Court of Appeals and the Arizona Supreme Court, Petitioner did not raise the Sixth Amendment ineffectiveness claim which he asserts in the pending Petition. (Respondents' Exhs. S and U) Rather, on appeal of the denial of his petition for post-conviction relief, Petitioner, at argued that "the trial court abused its discretion in failing to grant an evidentiary hearing regarding trial counsel's ineffectiveness for his failure ... to lodge an objection to the admission of coconspirator's statements." (*Id.*; Exh. S at 2, 7)

Consequently, Petitioner's assertion in Ground XVI that trial counsel was ineffective based on his failure to contact Schilinski before trial and for failing to obtain evidence that Petitioner was not a member of the conspiracy, was not properly exhausted in state court. *See Reese,* 541 U.S. at 32, 124 S.Ct. 1347; *Boerckel,* 526 U.S. at 845, 119 S.Ct. 1728. Petitioner's assertion of a claim of ineffective assistance of counsel based on one set of facts, does not exhaust other claims of ineffective assistance based on different facts. *Gauf v. Ontiveres,* No. CV–06–804–PHXDGC (JCG), 2007 WL 1713287, *5 (D.Ariz., June 12, 2007). As discussed in Ground V, *infra,* this claim is procedurally barred from federal habeas corpus review.

## J. Ground XXIV—Fourteenth Amendment Claim

In Ground XXIV, Petitioner argues that the Arizona Supreme Court's decision in *Evanchyk v. Stewart,* 202 Ariz. 476, 47 P.3d 1114 (2002), represented a significant change in the law and, if applied to his case, would have changed the outcome. (docket # 1 at 28) Petitioner asserts

that his Fourteenth Amendment rights were violated because his conviction for conspiracy to commit first-degree murder cannot stand under the rule announced in *Evanchyk*.[15]

Respondents assert that federal review of this claim is procedurally barred because Petitioner did not properly present this federal claim to the State courts. The Court agrees. Petitioner did not raise this Fourteenth Amendment claim either on direct appeal or on post-conviction review. (Respondents' Exhs. L, P, S at 5–6, U) Rather, he argued that pursuant to the Arizona Supreme Court's decision in *Evanchyk*, his conviction must be vacated. (*Id.*) Petitioner did not present a federal claim to the state courts. In his pending petition, although Petitioner mentions the Fourteenth Amendment, he relies on State law to support his claim that his conviction cannot stand. (docket # 1 at 28) A habeas petitioner may not "transform a state law issue into a federal one merely by asserting a due process violation." *Poland v. Stewart*, 169 F.3d 573, 584 (9th Cir.1999) (quoting *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir.1996)). Moreover, the record reflects that Petitioner has not exhausted the Fourteenth Amendment due process claim asserted in Ground XXIV. As discussed in Section V, *infra*, this claim is procedurally barred from federal habeas corpus review. *See Reese*, 541 U.S. at 32, 124 S.Ct. 1347; *Boerckel*, 526 U.S. at 845, 119 S.Ct. 1728; *Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir.1998).

## K. Ground XI(A)—Ineffective Assistance

In Ground XI(A), Petitioner asserts that trial counsel was ineffective in violation of the Sixth Amendment because he advised Petitioner that he could not be found guilty of conspiracy to commit first degree murder based on conditional intent. Petitioner contends that based on counsel's erroneous advice, he rejected the State's plea offer. He further argues that if trial counsel had "correctly interpreted the law," Petitioner "could have made a knowing, voluntary and intelligent decision whether or not to proceed to trial and avoid a life sentence." (docket # 1 at 15)

Respondents concede that Petitioner fairly presented this Sixth Amendment claim to the State courts on post-conviction review and that it is properly before this Court on habeas corpus review. (docket # 13 at 38)

### A. Legal Standard

To establish ineffective assistance of counsel, petitioner must establish that: (1) counsel's performance fell below objective standards of reasonableness and "outside the wide range of professionally competent assistance"; and (2) that counsel's performance prejudiced him by creating "a reasonable probability that absent the errors the fact finder would have had a reasonable doubt respecting guilt." *Strickland v. Washington*, 466 U.S. 668, 687–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the context of pleas and the plea process, ineffective assistance of coun-

---

**15.** In *Evanchyk*, the Arizona Supreme Court answered the following certified questions: (1) "Under Arizona law, may a defendant be convicted of conspiracy to commit first-degree murder when that conviction is based only on the commission of felony murder?"; (2) "Under Arizona law, if the defendant could be convicted of conspiracy to commit first-degree murder, must that defendant have possessed an intent to kill?"; and (3) "Under Arizona law, may a defendant be convicted of conspiracy to commit first-degree murder if he had merely the requisite intent to commit the underlying felony?" 202 Ariz. at 478–79, ¶ 6, 47 P.3d at 1116–17. The court answered the first and third questions in the negative, and the second question in the affirmative. *Id.* at 481, ¶ 481, 47 P.3d at 1119.

sel claims similarly require a showing of both deficient performance and resulting prejudice. *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985).

When analyzing the performance prong of the *Strickland* standard, a reviewing court engages a strong presumption that counsel rendered adequate assistance, and exercised reasonable professional judgment in making decisions. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. The review of counsel's performance under *Strickland* is "extremely limited": "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *Coleman v. Calderon*, 150 F.3d 1105, 1113 (9th Cir.1998) (emphasis added). Thus, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. If the prisoner is able to satisfy the performance prong, he must also establish prejudice. *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052; *see also Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (burden is on defendant to show prejudice).

A court need not determine whether counsel's performance was deficient before examining whether prejudice resulted from the alleged deficiencies. *Robbins*, 528 U.S. at 286, 120 S.Ct. 746. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* (quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052). To establish prejudice, a petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional

errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. When a petitioner alleges that he rejected a plea offer based on counsel's erroneous advice, he must show that, "but for counsel's error, he would have pleaded guilty and would not have insisted on going to trial." *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir.2002) (citing *Hill*, 474 U.S. at 59, 106 S.Ct. 366); *Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir.1995).

**B. Analysis of Ground XI(A)**

As previously stated, Petitioner alleges that trial counsel erroneously advised him that he could not be convicted of conspiracy to commit murder based only on conditional intent and that he rejected the State's plea offer based on counsel's advice. (docket # 1 at 15)

Petitioner raised this same claim in his petition for post-conviction relief. (Respondents' Exh. P) In support of his petition for post-conviction relief, Petitioner submitted an affidavit avowing that: (1) before trial, the State offered him a plea, whereby he could "plead guilty to conspiracy to commit escape" and receive "a six year sentence;" (2) trial counsel advised Petitioner that he "would not be convicted of conspiracy to commit first degree murder," a "specific" intent offense, based merely on "conditional" intent; (3) "the evidence did not demonstrate in this case that 'specific' intent existed, only a "conditional" intent;" and (4) Petitioner relied on trial counsel's advice when he rejected the State's plea offer and proceeded to trial. (Respondents' Exh. EE)

The trial court found that Petitioner's trial counsel was not deficient in advising Petitioner of the State's plea offer. (Respondents' Exh. R at 13) As discussed below, the state court's determination was neither contrary to, nor an unreasonable

application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). Assuming that trial counsel advised Petitioner that he could not be convicted of conspiracy to commit first degree murder based on conditional intent, as Petitioner claims, counsel's advice did not fall below an objective standard of reasonableness.

The State of Arizona charged Petitioner with conspiracy to commit first degree murder under A.R.S. §§ 13–1003 and 13–1105. Arizona Revised Statute § 13–1105 (2000) provides that a person commits first degree murder if "[i]ntending or knowing that the person's conduct will cause death, the person causes the death of another with premeditation." *Id.* A person commits conspiracy if, "with the intent to promote or aid the commission of an offense, such person agrees with one or more persons that at least one of them or another person will engage in conduct constituting the offense and one of the parties commits an overt act in furtherance of the offense, except that an overt act shall not be required if the object of the conspiracy was to commit any felony upon the person of another." A.R.S. § 13–1003.

At the time of Petitioner's trial in 2001, first degree murder, as defined in A.R.S. § 13–1105, was considered a "specific intent" crime which required the specific intent to kill another person. *See State v. Murray,* 184 Ariz. 9, 32, 906 P.2d 542, 565 (1995); *State v. Fisher,* 176 Ariz. 69, 79, 859 P.2d 179, 189 (1993); *State v. Cook,* 170 Ariz. 40, 49, 821 P.2d 731, 740 (1991); *State v. Lavers,* 168 Ariz. 376, 389, 814 P.2d 333, 346 (1991); *State v. Hall,* 129 Ariz. 589, 594, 633 P.2d 398, 403 (1981); *State v. Means,* 115 Ariz. 502, 504, 566 P.2d 303, 305 (1977); *see generally* A.R.S. § 13–1105. At that time, Arizona courts had not addressed whether "conditional"

intent satisfied the *mens rea* of a "specific" intent crime. States which had addressed that issue were split. *Compare, e.g., State v. Irwin,* 55 N.C.App. 305, 285 S.E.2d 345, 349 (N.C.1982) and *State v. Kinnemore,* 34 Ohio App.2d 39, 295 N.E.2d 680, 681–83 (1972) (both holding that conditional intent not sufficient to satisfy *mens rea* for specific intent crime assault with the intent to kill); with *Holloway v. United States,* 526 U.S. 1, 9–11, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (holding that conditional intent sufficient to satisfy specific intent *mens rea* in federal carjacking statute); *People v. Vandelinder,* 192 Mich.App. 447, 481 N.W.2d 787, 788–89 (Mich.1992) (holding that conditional intent sufficient to satisfy specific intent *mens rea* for solicitation to commit murder offense).

It is "universally recognized" that "an attorney is not liable for an error of judgment on an unsettled proposition of law." *Smith v. Singletary,* 170 F.3d 1051,1054 (11th Cir.1999) (citation omitted). Thus, "giving ... legal advice that later is proven to be incorrect [ ] does not necessarily fall below the objective standard of reasonableness." *Id.* At the time of Petitioner's trial, Arizona courts had not addressed whether a defendant could be convicted for a specific intent crime based on conditional intent. There were no reported Arizona decisions providing guidance on this issue, and other states were split on this issue. As Petitioner himself noted in his pleadings filed in State court, Arizona law on this issue was unsettled. (Respondents' Exh. M at 8; Exh. S at 8) Thus, Petitioner's trial counsel had to rely on the plain language of the relevant statute, A.R.S. § 13–1105, and case law discussing that statute. At the time of Petitioner's trial, the governing law indicated that a defendant must have specific intent, not conditional intent, to kill in order to be found guilty of conspiracy to commit first degree murder pursuant to A.R.S. § 13–1105 and

§ 13–1003. *See Murray,* 184 Ariz. 9, 906 P.2d 542. In view of the prevailing Arizona law, counsel's advice to Petitioner did not fall below an objective standard of reasonableness. *See Smith,* 170 F.3d at 1053–56 (rejecting petitioner's claim that trial counsel's performance was deficient for erroneously advising him that his out-of-state conviction could not be used to enhance his sentence "in light of the uncertainty in Florida law at the time the advice was given," including the fact that there were no reported appellate decisions providing guidance, making it a "live issue in Florida law."); *Johnson v. Carroll,* 327 F.Supp.2d 386, 398 (D.Del.2004) (trial counsel's failure to object admission of drug courier profile testimony was not deficient performance "[given the unsettled nature of this issue at the time of Petitioner's trial,]" including the fact that Delaware courts had not yet addressed whether such evidence was admissible, and there was a split of authority in the federal courts); *Enoch v. Gramley,* 861 F.Supp. 718, 747–48 (C.D.Ill.1994) (counsel's mistaken interpretation of state law not so unreasonable as to constitute Sixth Amendment violation even where counsel's conclusion was contrary to clear language of statute and uniform case law); *see also Cianbro Corp. v. Jeffcoat & Martin,* 804 F.Supp. 784, 790 (D.S.C.1992) ("[A]n attorney cannot be held liable for following the plain terms of a statute when there are not compelling circumstances to suggest [otherwise,]" even when a court later decides that interpretation is erroneous).

Moreover, even assuming counsel's performance was deficient, it did not prejudice Petitioner. To establish prejudice in the context of the plea process, Petitioner must show that, "but for counsel's error, he would have pleaded guilty and would not have insisted on going to trial." *Turner,* 281 F.3d at 879 (citing *Hill,* 474 U.S. at 59, 106 S.Ct. 366). Petitioner has not established that he "would have" pleaded guilty absent trial counsel's advice that he could not be found guilty of conspiracy to commit first-degree murder based on conditional intent. In his Petition, Petitioner only asserts that "[h]ad counsel correctly interpreted the law, I could have made a knowing, voluntary and intelligent decision *whether or not* to proceed to trial." (docket # 1 at 15) (emphasis added) This allegation is insufficient to establish prejudice. *See Hill,* 474 U.S. at 60, 106 S.Ct. 366 (petitioner's allegations insufficient to establish prejudice under *Strickland* where he did not allege in his habeas petition that, had counsel correctly advised him, he "would have" pleaded guilty); *Turner,* 281 F.3d at 879 (petitioner must show that, "but for counsel's error, he would have pleaded guilty and would not have insisted on going to trial."). Similarly, Petitioner's avowal in his affidavit attached to his petition for post-conviction relief (Respondents' Exh. EE) that he "relied on" his trial counsel's advice and "rejected the plea agreement based on same and proceeded to trial" is also insufficient to establish prejudice. Petitioner's affidavit is merely a self-serving, conclusory statement which lacks supporting evidence. *See Engelen v. United States,* 68 F.3d 238, 240–41 (8th Cir.1995) (defendant failed to establish prejudice where he made "no direct assertion that he would have pled guilty if his counsel had" properly advised him); *Ellzey v. United States,* 210 F.Supp.2d 1046, 1051 (C.D.Ill.2002) (counsel's failure to advise defendant to accept plea agreement did not prejudice defendant absent any evidence, other than defendant's self-serving affidavit, that he would have accepted plea absent counsel's advise); *Wanatee v. Ault,* 101 F.Supp.2d 1189, 1204 (N.D.Iowa 2000) (to show prejudice resulting from counsel's deficient advice, petitioner must offer more than self-

serving statements; rather he must present credible, nonconclusory evidence that he would have pleaded guilty had he been properly advised).

In his Reply, Petitioner again asserts that based on counsel's erroneous advice, "he could not have made an intelligent, knowing, or voluntary choice of whether to accept or reject the State's plea offer." (docket # 18 at 99) While this allegation is relevant to whether counsel's performance was deficient, it does not satisfy the prejudice prong of the *Strickland* analysis. Specifically, Petitioner does not assert that "but for counsel's error, he would have pleaded guilty and would not have insisted on going to trial." *Turner*, 281 F.3d at 879 (citing *Hill*, 474 U.S. at 59, 106 S.Ct. 366).

Finally, there is no evidence that the jury convicted Petitioner of conspiracy to commit first degree murder based on solely on conditional intent. In fact, the trial court neither instructed the jury regarding conditional intent nor informed the jury that it could convict based on conditional intent. (Respondents' Exh. LL) Rather, the trial court instructed the jury regarding the statutory elements of conspiracy to commit first degree murder, including the requirement that the jury find that Petitioner "caused the death of another person" "with premeditation." (Respondents' Exh. MM at 6–14) The court further instructed the jury that "premeditation" was defined as acting with "either the intention or the knowledge that he or she will kill another human being when such intention or knowledge precedes the killing by any length of time to permit reflection." (*Id.* at 9) The evidence at trial supported the jury's finding that Petitioner had specific intent to commit the crime of conspiracy to commit first degree murder. (Respondents' Exh. FF at 105–06, 120)

In summary, even assuming counsel's performance was deficient, Petitioner has not established prejudice. Accordingly, he is not entitled to habeas corpus relief on his claim of ineffective assistance of counsel asserted in Ground XI(A).

## V. Procedural Bar

 As discussed above, Petitioner did not present most of his federal claims to the state courts and any attempt to return to state court to present those claims would be futile because they would be procedurally barred pursuant to Arizona law. First, Petitioner is time-barred under Arizona law from raising these claims in a successive petition for post-conviction relief because the time for filing a notice of post-conviction relief has long expired. *See* Ariz.R.Crim.P. 32.1 and 32.4 (a petition for post-conviction relief must be filed "within ninety days after the entry of judgment and sentence or within thirty days after the issuance of the order and mandate in the direct appeal, whichever is later.") Although Rule 32.4 does not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P 32.1(d) through (h), Petitioner has not asserted that any of these exceptions apply to him. Moreover, a state post-conviction action is futile where it is time-barred. *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir.2002); *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th Cir.1997) (recognizing untimeliness under Ariz. R.Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under Rule 32.2(a)).

Furthermore, under Rule 32.2(a) of the Arizona Rules of Criminal Procedure, a defendant is precluded from raising claims that could have been raised on direct appeal or in any previous collateral proceeding. *See Krone v. Hotham*, 181 Ariz. 364, 366, 890 P.2d 1149, 1151 (1995) (capital defendant's early petition for post-conviction relief raised limited number of issues

and waived other issues that he could have then raised, but did not); *State v. Curtis*, 185 Ariz. 112, 113, 912 P.2d 1341, 1342 (Ariz.App.1995) ("Defendants are precluded from seeking post-conviction relief on grounds that were adjudicated, or could have been raised and adjudicated, in a prior appeal or prior petition for post-conviction relief."); *State v. Berryman*, 178 Ariz. 617, 624, 875 P.2d 850, 857 (Ariz.App. 1994) (defendant's claim that his sentence had been improperly enhanced by prior conviction was precluded by defendant's failure to raise issue on appeal). The aforementioned unexhausted claims could have, and should have, been, properly raised either on direct appeal or on post-conviction review. Accordingly, the State court would find those procedurally barred.

### A. Cause and Prejudice

As set forth above, Petitioner's claims raised in Grounds I, II, III (allegations pertaining to heightened presence of law enforcement), V (allegations pertaining to the indictment itself), VI, VII, VIII, IX, X, XI(B), XII, XIII, XIV(A), (B), (C), (D), (E); XV(A), (B), (C), (D), (E); XVI, XVII, XVIII(A), (B), XIX, XX, XXI, XXII, XXIII, XXIV are procedurally defaulted and barred from federal habeas review absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice."

To establish "cause," a petitioner must establish that some objective factor external to the defense impeded his efforts to comply with the state's procedural rules. *Id.* The following objective factors may constitute cause: (1) interference by state officials, (2) a showing that the factual or legal basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance of counsel. *Id.* Prejudice is actual harm resulting from the constitutional violation or error. *Magby v. Wawrzaszek*,

741 F.2d 240, 244 (9th Cir.1984). Where petitioner fails to establish cause for his procedural default, the court need not consider whether petitioner has shown actual prejudice resulting from the alleged constitutional violations. *Smith v. Murray*, 477 U.S. 527, 533, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986).

Petitioner generally argues that he satisfies the cause and prejudice standard. (docket #18 at 146–153) However, he does not articulate any specific basis to overcome the procedural bar. As a general matter, Petitioner's *pro se* status and ignorance of the law do not satisfy the cause standard. *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 908 (9th Cir.1986); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir.1988).

Additionally, to the extent Petitioner asserts that ineffective assistance of appellate counsel constitutes cause, that claim fails. Although constitutionally ineffective assistance of counsel can constitute cause for a procedural default, "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 535, 106 S.Ct. 2661. Before an ineffective assistance of counsel claim can be considered "cause" to excuse the procedural default of another constitutional claim, the petitioner must have fairly presented the ineffective assistance of counsel claim in state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451–52, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) ("In other words, ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim. And we held in *Carrier* that the principles of comity and federalism that underlie our longstanding exhaustion doctrine ... re-

quire that constitutional claim, like others, to be first raised in state court."); *Dellinger v. Bowen,* 301 F.3d 758, 766 (7th Cir. 2002) ("In other words, the claim of ineffective assistance must be raised in state court before it can suffice on federal habeas relief as 'cause' to excuse the default of another claim [even if that other claim is also ineffective assistance of counsel]. If the second claim of ineffective assistance is itself defaulted, the petitioner will be fully defaulted."); *Oken v. Corcoran,* 220 F.3d 259, 265 (4th Cir.2000) (ineffectiveness of appellate counsel could not serve as cause for procedurally-defaulted claim because petitioner never raised ineffectiveness claim in Maryland court); *Carrier,* 477 U.S. at 489, 106 S.Ct. 2678.

The record reflects that Petitioner did not properly exhaust in state court a claim that appellate counsel was ineffective for failing to properly raise his claims on direct appeal. Therefore, any deficiency in counsels' representation cannot excuse Petitioner's procedural default on these claims.

■■■ Similarly, Petitioner cannot establish cause by blaming post-conviction counsel for failing to raise his claims on post-conviction review, because "the right to counsel does not extend to state collateral proceedings." *Martinez–Villareal,* 80 F.3d at 1306; *see also Coleman,* 501 U.S. at 752–53, 111 S.Ct. 2546; *Murray v. Giarratano,* 492 U.S. 1, 7–12, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989) (the Constitution does not require states to provide counsel in post-conviction proceedings); *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987). When a petitioner has no constitutional right to counsel, there can be no constitutional violation arising out of ineffective assistance of counsel. *Coleman,* 501 U.S. at 752, 111 S.Ct. 2546. In view of the foregoing, a claim of ineffective assistance

of post-conviction counsel does not constitute cause to excuse Petitioner's procedural default. *See, Martinez–Villareal,* 80 F.3d at 1306.

In summary, Petitioner offers no legitimate "cause" which precluded him from properly exhausting his state remedies. Accordingly, the Court declines to reach the issue of prejudice. *Engle v. Isaac,* 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

**B. Fundamental Miscarriage of Justice**

Petitioner further argues that failure to consider his claims will result in a fundamental miscarriage of justice. A federal court may review the merits of a procedurally defaulted habeas claim if the petitioner demonstrates that failure to consider the merits of his claim will result in a "fundamental miscarriage of justice." *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). A "fundamental miscarriage of justice" occurs when a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Id.*

■■ This gateway "actual innocence" claim differs from a substantive actual innocence claim. *Smith v. Baldwin,* 466 F.3d 805, 811–12 (9th Cir.2006). The Supreme Court described the gateway showing in *Schlup,* 513 U.S. at 315–16, 115 S.Ct. 851, as a less stringent standard than a substantive claim of actual innocence. *See also Carriger v. Stewart,* 132 F.3d 463, 476 (9th Cir.1997) (suggesting that a "habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt and must affirmatively prove that he is innocent."). If Petitioner passes through the *Schlup* gateway, the court is only permitted to review his underlying constitutional claims. *Smith,* 466 F.3d at 807. The fundamental miscarriage

of justice exception applies only to a "narrow class of cases" in which a petitioner makes the extraordinary showing that an innocent person was probably convicted due to a constitutional violation. *Schlup v. Delo,* 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To demonstrate a fundamental miscarriage of justice, Petitioner must show that "a constitutional violation has resulted in the conviction of one who is actually innocent." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851. To establish the requisite probability, Petitioner must prove with new reliable evidence that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 324, 327, 115 S.Ct. 851. New evidence presented in support of a fundamental miscarriage of justice may include "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Id.* at 324, 115 S.Ct. 851, *see also, House v. Bell,* 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (stating that a fundamental miscarriage of justice contention must involve evidence that the trial jury did not have before it).

Although Petitioner asserts that failure to consider his claims will result in a fundamental miscarriage of justice, he has not established that, in light of newly discovered evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 324, 327, 115 S.Ct. 851.

## VI. Conclusion

In view of the foregoing, the Petition for Writ of Habeas Corpus should be denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus (docket # 1) be **DENIED.**

This recommendation is not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rules of Appellate Procedure 4(a)(1), should not be filed until the District Court enters judgment. The parties shall have ten days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See,* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e). Thereafter, the parties have ten days within which to file a response to the objections. Failure timely to file objections to the Report and Recommendation may result in the acceptance of the Report and Recommendation by the District Court without further review. *See United States v. Reyna–Tapia,* 328 F.3d 1114, 1121 (9th Cir.2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. Fed.R.Civ.P. 72.

DATED this 22nd day of July, 2008.